### SHERRY v. DOYLE et ux.

No. 4272. Decided June 9, 1926. Rehearing Denied Sept. 22, 1926.
(249 P. 250.)

*F. W. James,* of Salt Lake City, for appellants.

*William J. Lowe,* of Salt Lake City, for respondent.

STRAUP, J.

This is an habeas corpus proceeding involving the custody of a child about four years of age. Sherry, the respondent,

and who was plaintiff below, had judgment from which the Doyles appeal. They assail the findings on the ground of insufficiency of the evidence, and the conclusions and judgment as being contrary to law.

The plaintiff averred that he was the father of the child and that upon the death of his wife he arranged with the defendants to care for the child, until he was prepared to otherwise provide a home for it; that an arrangement to care for the child had been made by him with a Mrs. Frost at Grouse Creek, where the plaintiff resided, and where he could associate with the child and enjoy its companionship; and that he had demanded possession of the child from the defendants, and they refused to give it up.

The defendants answered denying that they unlawfully detained the child, and alleging as affirmative defense that—

"Plaintiff delivered the custody of said child to defendants and agreed to pay board for the said child. That after the child had been with defendants for a considerable length of time, the petitioner gave the said child to these defendants, and agreed with them that they may have the said child and may legally adopt the same as their child. That the best interests of the said child would be subserved by leaving the child with these defendants. That they are fit and proper persons to have the care, control, and custody of the said child."

The case was tried to the court. Among other findings, the court found:

"(1) That the plaintiff, Thomas Sherry, is the natural father of Paddeen M. H. Sherry, a minor child, of the age of four years and four months.

"(2) That on or about the 20th day of July, 1920, plaintiff and defendants herein entered into an agreement whereby, for a valuable consideration to be paid from time to time by plaintiff to defendants, defendants undertook and agreed to care for, support, and maintain said minor child, daughter of plaintiff; that said arrangement was to continue during the pleasure of the parties to the agreement; that pursuant to said agreement plaintiff delivered said minor child into the care, custody, and control of defendants, and not otherwise.

"(3) That plaintiff at no time has abandoned, relinquished, or forfeited, nor has he intended to abandon, relinquish or forfeit, his natural right as father to the custody and control of his said infant child, but that plaintiff undertook and agreed to compensate defendants for whatever services they might render in behalf of said minor child; that from time to time payments have been made by plaintiff to defendants for said services and pursuant to the agreement aforesaid.

"(4) That plaintiff has not, by agreement, conduct, or otherwise, or at all, divested himself of his natural right as parent to have the custody, support, maintenance, and association of his said minor child.

"(5) That plaintiff, Thomas Sherry, is a resident of Grouse Creek, in Box Elder county, Utah, and has provided a home for said child in Grouse Creek, Box Elder county, Utah, with Mrs. Clara E. Frost, where the said child can grow up under plaintiff's direction and care and affection, and where said child will be given loving motherly care and every advantage and attention which a child of such tender years may require, and where plaintiff will be permitted to associate with and enjoy the love and affection of said child."

"(8) That plaintiff, Thomas Sherry, is in all respects a fit and proper person to have the custody and control of his said minor child, Paddeen M. H. Sherry, and is entitled to the possession and custody of said minor child; that Mrs. Clara E. Frost is likewise a fit and proper person to have the custody of said minor child, pursuant to arrangements which have been or may hereafter be entered into between her and the said Thomas Sherry relative to the care and custody of said child."

These findings, though challenged, are supported by the greater weight of the evidence. Indeed, as to the essentials of them, we do not find any substantial conflict in the evidence. The plaintiff was at the time of the trial 60 years of age. He and his wife, the mother of the child, resided some of the time at Grouse Creek, where the plaintiff was engaged in mining, and some of the time in Ogden. When she was about to be confined she went to the Crittenden Home in Ogden. When the child was born, the plaintiff was at work in Idaho. No delict or neglect is claimed because of such absence. The mother died shortly after the birth of the child. The child, after it was born and before the funeral, was cared for at the home. The plaintiff had no relatives in this country. After the funeral, he made arrange-

ments with a man and wife to care for the child for a month, until other arrangements could be made. He then went to Grouse Creek looking after the mine. The man and wife kept the child 10 or 11 days and took it back home. The home notified the plaintiff. He came in and made arrangements with a Mrs. Brandies to temporarily care for the child. She was willing to take the child permanently, if the plaintiff would consent to her adoption of it, but the plaintiff would not do that. Mrs. Brandies then agreed to care and cared for the child until other arrangements could be made. The plaintiff made arrangements with a Mrs. Shaum to care for the child at $10 per week, who then received the child from Mrs. Brandies and cared for it. Plaintiff testified he then was earning only about $16 per week and did not feel able to pay the amount agreed upon.

Some one recommended Mrs. Doyle, one of the defendants, to him. The Doyles were then strangers to him and resided at Willard. Upon seeing and consulting with the Doyles, Mrs. Doyle agreed to take and care for the child at the rate of $25 per month, and thereupon plaintiff and Mrs. Doyle got the child from Mrs. Shaum. That was in July, 1920, when the child was from 3 to 3½ months old. The child from that time until the commencement of this action was with the Doyles. There is no dispute in the evidence that the arrangement made with the Doyles was as found by the court. Indeed, the Doyles, did not themselves deny that. What they claim is that thereafter, some time in 1922 or 1923, the plaintiff told them that they might adopt the child or that it perhaps was best for them to adopt it. But the plaintiff denied that, and in many particulars his testimony in such respect is corroborated. There is no factor more prominent in the case than that the plaintiff at all times was opposed to, and declined to let, anyone adopt the child. Mrs. Brandies, Mrs. Shaum, and Mrs. Frost were each willing to adopt the child, but the plaintiff would not consent to it. The plaintiff paid the Doyles $25 per month for the first year. There is no dispute as to that. There is a dispute

as to how much the plaintiff paid thereafter. He testified he made considerable payments thereafter and paid a $250 assessment on mining stocks of Doyle, made a payment on Doyle's automobile, bought some groceries for him, and gave him a note secured by a mortgage. Doyle admitted the payment of the assessment, but denied that the note and mortgage were given for the care of the child. However, neither Doyle nor Mrs. Doyle testified as to how much money was received by them, or how much was still due them and unpaid. Apparently such matters was not considered, nor was it, of controlling importance. Of course, no claim is made by the Doyles to the custody of the child, or to its detention, because the expenses of its care had not been fully paid. In the fall of 1923, the plaintiff helped Doyle in farm work on Doyle's farm. The Doyles in the meantime had moved from Willard to Woods Cross, Davis County. Plaintiff testified he then discovered that Doyle used bad language in the presence of the child, and plaintiff remonstrated with him and Mrs. Doyle about it. Shortly thereafter plaintiff went back to Grouse Creek to his mine and made arrangements with Mrs. Frost to care for the child, and several times demanded possession of it from the Doyles. But each time they refused to give the child up, which led to the institution of these proceedings on the 1st of July, 1924, and a decree on the 12th of August, 1924, awarding the child to the plaintiff.

The plaintiff was president, manager, and superintendent of, and a large stockholder in, a mining company whose property is at or near Grouse Creek. The plaintiff for some time, for many years, resided at Grouse Creek, and for some time spent most of his time at the mine. The extent or character of the mine or the value of the mining property was not shown. It was shown that plaintiff owned a large block, if not the controlling interest, of the capital stock of the company, but the value of the stock was not shown. No evidence was adduced with respect to such questions. We have therefore, no means of knowing whether the mine or the capital stock of the company was of much or of little or of no sub-

stantial value, nor is it shown what salary or compensation was paid or was to be paid plaintiff, as manager or superintendent. Nor was it shown that the plaintiff owned no other property, nor what his earnings or earning capacity was. No evidence was adduced respecting any such matters. It was not alleged that the plaintiff was not able to properly take care of the child, nor that he was unfit or unsuitable to have its custody. Nor was the ability of the defendants shown, except that they, a few years prior to the trial, had contracted to purchase a farm of about 60 acres at or near Woods Cross. But how much they had agreed to pay for the farm, or how much they had paid on it, or how much they still owned on it, was not shown. Plaintiff testified that the defendants at times did not have sufficient means to even buy groceries, and that he gave them money for such purpose. The defendants denied that and testified that they always had plenty to eat; that they sold butter, milk, and vegetables. But what their income was was not shown. Doyle testified that he was a boiler maker and worked some of the time for a railroad company in Salt Lake City, but when they transferred him, or were about to transfer him, to Soldier Summit he gave up that work because it was too far from his home. But what income or means or ability the Doyles had to maintain the child was not shown. On the record we do not see that the defendants are shown to have better means than has the plaintiff, or that they were more able than he to support or maintain the child.

But of more importance, as we think, is this: Mrs. Frost, with whom arrangements were made to care for the child, testified that she was 55 years of age; that she had known the plaintiff for about 30 years, and that she was acquainted with his wife, the mother of the child, when she resided at Grouse Creek; that she wanted to adopt the child when it was born but the plaintiff "would not listen to that"; that she had reared a family of six children, all of whom were married but the youngest child, a boy about 15 years of age, who lived at home; that she and her husband had resided at

Grouse Creek for many years; that they owned about 285 acres of hay and farm lands, and in addition some range lands; that they owned between 300 and 400 head of cattle, and before her husband went into the cattle business he owned two bands of sheep; that none of their property, either real or personal, was incumbered; that they owned a modern and comfortable dwelling of seven rooms with bath, etc.; that the plaintiff made arrangements with her to care for the child indefinitely, and that, if the child was turned over to her, it could stay with her as long as the plaintiff and the child desired and never would be turned away; that she would care for the child as though it were her own; that she and her husband had all the conveniences of an ordinary and modern home; that they had good schools and a good church, and that if the child was given to her it would have all advantages of home, school, and church training. This testimony is not disputed.

There is some conflict in the evidence as to the health of the child when the Doyles received it. They testified it then was frail, and very nervous. Mrs. Shaum testified the baby was nervous, different persons having it had different ways of feeding it, but she "got along fine" with it, "without a great deal of trouble," and while it was a nervous baby, it was not as nervous as some other babies cared for by her. However, on the record, it may be conceded the baby, when the Doyles received it, was more nervous than babies of that age usually are and that Mrs. Doyle gave it proper attention and properly cared for it. But that was her contract, and because she in such respect performed it gave her no right to keep the baby.

Several witnesses testified that the general reputation of Doyle was bad; that he used "terrible language" that could be heard for blocks, and that he "was dishonest." Two witnesses testified on behalf of Doyle, one that Doyle was "as good a neighbor as I ever had" and the other that his reputation was "as good as the average." Neither the character nor the reputation of the plaintiff was in any particular assailed,

nor was it claimed that he was unfit or unsuitable, or in dis-repute, or that he was in ill health, or was unable to earn a living for himself and the child.

We thus have a situation where the plaintiff has shown a clear legal right to the custody of the child, and where the defendants have shown no legal right what-ever. No one claims to the contrary. No abandonment or forfeitures or laches or legal surrender or unfitness or inability on the part of the plaintiff was either alleged or shown. We thus think the legal right of a fit and suitable parent to the custody of his child ought not to be denied him as against an opposing claimant, himself without a legal right to its custody. In such case, as several times declared by this court, it may well be presumed that the care and custody of a child, and its interest and welfare, will best be subserved under the control of the parent.

But not only that, the evidence without any substantial dispute shows, and the court found, that the home provided for the child with Mrs. Frost will give the child every advantage and attention that a child of such years requires, and on the record we are well satisfied that the home influences and surroundings of the child will as well, if not better, be subserved with Mrs. Frost than with the defendants. We have no doubt Mrs. Doyle has taken good care of the child, and that she has become attached to it. But to care for the child for compensation for an in-definite period, and, as found by the court, without any agreement or arrangement for any other or different cus-tody of the child, was what she had contracted to do. When she took the child she, of course, knew that in caring for and fondling it she would become attached to it. That was but natural. But such attachment ought not to outweigh the at-tachment of a natural and suitable parent not guilty of laches or forfeiture. Plaintiff's feelings in such respect are to be considered just as much as those of Mrs. Doyle. They are no less worthy. And, so far as the child is concerned, its welfare will be as well, if not better, subserved with the

plaintiff and Mrs. Frost at the place of the plaintiff's residence, and where the child and father may frequently and conveniently enjoy each other's company and society, as with the Doyles where such relation will to a large extent be denied them. Unless the plaintiff is immoral or unfit, such association and companionship of the father and the child is the right of both and ought not to be denied to either. The comforts and benefits of such an association with one of the child's own flesh and blood usually are far more advantageous than an association with strangers.

We think the case is controlled by the cases of *Harrison v. Harker*, 44 Utah, 541, 142 P. 716; *Jones v. Moore*, 61 Utah, 383, 213 P. 191; and *Jensen v. Earley*, 63 Utah, 604, 228 P. 217. This of the concurring opinion in *Harrison v. Harker*, supra, was in *Jones v. Moore* quoted and approved by this court:

"Much is said concerning the law of the case, and that the welfare of the child is of primary consideration. The doctrine, when properly understood and applied, may be conceded. The presumption is that parents are fit and suitable to be intrusted with the care and custody of their child, and that its interests and welfare are best subserved under their care and control. Before their legal right to its custody will be denied or invaded by the court, I think it must be made to appear that they in some manner have legally surrendered or forfeited such right or abandoned the child, or are morally unfit to have its custody, or are unable to properly provide for it in their own style and station in life. So when it is said that in determining a disputed custody of a child the primary consideration is its welfare, such statement should be considered in connection with the above propositions. For I do not think any one will seriously contend that, as against a stranger, a parent's legal right to the custody of his child will be denied him, where an abandonment or a forfeiture, or laches, or a legal surrender, or unfitness, or inability of the parent is not clearly shown."

In *Jones v. Moore,* this court again said:

"Without now pausing to go into the question of what may be involved within the term 'best interests,' it must suffice to say that that term, as it is understood and applied in cases like the one at bar, has reference more particularly to the moral welfare than to mere comforts, benefits, or advantages that wealth can give. If such were not

the case, poor parents could not sustain their right to the custody of a child in which a rich man has taken a special interest and where between himself and the child there exists a strong liking or affection. It is the comparatively poor and not the rich parents who rear the large families and who give to the world a large majority of the men and women who conduct its affairs. Unless, therefore, a parent has by his acts and conduct in some way forfeited or lost the right to custody of his minor child, the presumptions respecting his right to have such custody are all in his favor. If the cases of this character heretofore decided by this court are critically examined, it will be found that such is the spirit that pervades all of them.

"No hard and fast rule with respect to what may be considered the best interests of a child can, however, be laid down to govern in all cases. Each case must be determined upon its own peculiar facts and circumstances."

In *Jensen v. Earley,* this was quoted and approved from the case of *Hummel v. Parrish,* 43 Utah, 382, 134 P. 898:

"The legal presumption is that it is for the best interests of the child and of society for the child to remain with its natural parents during the period of its minority and be maintained, cared for and educated by them and under their supervision and direction."

In harmony with such views, we think the judgment should be affirmed with costs to respondent. Such is the order.

GIDEON, C. J., and THURMAN and CHERRY, JJ., concur.

FRICK, J. (concurring.)

I was strongly of the impression that the judgment should be reversed and the child awarded to the defendant Esther Doyle, for the reason that the plaintiff, although the father, had no home, nor any prospects of ever having one, and had no friends or relatives to whom he could intrust the care of the infant. In view, however, that my associates are all of the opinion that the child should remain with the father, I yield to their judgment.