## WALTON v. COFFMAN et ux.

No. 6883.   Decided May 14, 1946.   (169 P. 2d 97.)

2

See 46 C. J., Parent and Child, sec. 29; 39 Am. Jur. 607.

*Howard F. Coray* and *Edward W. Clyde,* both of Salt Lake City, for defendants and appellants.

*C. Vernon Langlois,* of Salt Lake City, for plaintiff and respondent.

WADE, Justice.

Plaintiff, Virginia Walton, brought this action for a writ of habeas corpus to recover custody of her two minor children from the defendants, the Coffmans, who are her father and mother. On March 4, 1934, immediately after her eighteen birthday, Virginia married Ray Williams, and Marilyn Williams was born to them in September of that year. About May 30, 1935, Williams deserted Virginia and she and her baby went to live with her parents; at that time she was pregnant and Robert Lee Williams was born on October 3, 1935. Marilyn and Robert, hereinafter called Bobby, are the children involved in this action.

Virginia obtained a divorce from Williams, after Bobby's birth, in the fall of 1935. She went to work as an elevator girl at $40 per month on Thanksgiving day of that year and while she worked her mother took care of her children. She continued to hold this job, at least part of the time, until she married Vincent P. Walton on May 8, 1939. She has three children from that marriage. Prior to that marriage in June 1937 she married Joe Wheat, and shortly thereafter she moved to an apartment away from her parent's home but the two children involved herein, continued to live with her parents until sometime in March of 1938, when her husband Wheat was employed in St. George, Utah, at which time she took the children and went to that city. Bobby remained with her for only about a week when he was returned to the home of her parents, but Marilyn remained and lived with Virginia until she left Wheat and returned to live with her parents about Labor day in 1938. Only about a month of that time was spent at St. George—the rest of the time Virginia occupied the apartment in Salt Lake City. About November 9, 1938, Virginia obtained a divorce from Wheat. No children were born from that marriage.

Shortly after her marriage to Walton on May 8, 1939, Virginia quit her job and they moved into a home owned by his parents on Kensington Avenue which is only a short

distance from the home of her parents. They lived in that home for about 22 months, until March or April of 1941. During that time and all the time since until shortly before this action was brought, Marilyn has lived with Virginia. There is a sharp conflict in the evidence as to how much of the time Bobby lived with his mother and how much he lived with his grandparents during the time the Waltons lived on Kensington Avenue; each side claims that during that time he slept nights and kept his clothes with them, but each conceded that some of the time he slept at the home of the other party, and that he was back and forth a great deal from one home to the other. We are of the opinion that during that time Virginia purported to have him living with her but that his grandparents always had a bed and a change of clothing for him at their place and that he slept nearly half of the time at their home. After the Waltons moved from the Kensington Avenue home Bobby went to live with his grandparents and has made his home with them up to the time of the events out of which this action arose.

Sometime in October of 1944, the Coffmans went to Virginia's home and found Marilyn alone with the younger children; they waited there a while until Virginia returned. She was in an automobile with two men and was so under the influence of intoxicating liquor that she had to be helped into the house, where she set fire to a bed in lighting a cigarette. The Coffmans attempted to get her husband's mother to take care of her and the children, and failing in that they took her and all her children to their home. A quarrel ensued over her manner of living, and Virginia by telephone located a friend who was a state highway patrolman, who took her and the younger children away, but she left Marilyn and Bobby with her parents. Later her husband demanded that the grandparents surrender the children to her which they failed to do. Thereafter she contacted the children as they were on their way from school and attempted to take them forceably. The children ran

from her and Marilyn succeeded in getting away but she caught Bobby and took him with her.

Thereafter a proceeding was commenced in the juvenile court in the interest of these children, involving their custody, and later on June 14, 1945, Virginia commenced this action in the district court and obtained a writ of habeas corpus to obtain the custody of these two children. Thereupon it was stipulated that Bobby would be returned to the grandparents and the action in the juvenile court would be dismissed without prejudice. This stipulation being complied with the matter was tried in the District Court.

The defendants contend that the question of what is for the best interest and welfare of these children is controlling in this case. They further contend that the evidence is conclusive that Virginia and her husband both habitually become intoxicated; that Virginia visits beer halls, both with and without her husband, and associates with men other than her husband. They argue that from these facts and the further fact that these children have been raised in the home of the defendants, Bobby practically all of his life and Marilyn up to the time her mother married Mr. Walton, it will be for the best interest and welfare of these children that they be placed in the custody of the defendants.

Virginia admits that she and her huband drink intoxicating liquor but claim that they never became intoxicated; she admits that while she was married to Wheat she went out with her present husband, and that since she married her present husband she has been out with Wheat and that for a time she considered divorcing her present husband and remarrying Wheat. She admits that on one occasion she went to a beer hall without her husband and took one of her smaller children along, and there drank beer and while there she met a man whom she had never seen before or since, that this man drove her and the baby with him to an auto tourist camp where he rented and paid for a cabin for them for the night and registered them as husband and wife. She, however, claims that the man never entered the cabin while she was there but left the camp immediately

after registering, and that she and the baby occupied the cabin that night alone. She produced some corroborating testimony to that effect. She contends that nothing really wrong has ever happened between her and other men, and that her drinking and going to beer halls has not in any way interfered with her care of her children.

On the other hand she contends that it is not for the best welfare of the children to be placed in the custody of her parents. That while her mother is a devout and religious woman who has taken excellent care of her children while they have been in her home and is a person of high moral standards, still she is a person of very strong will who insists on the other members of her family following her wishes even against their own will, to such an extent that the others do not openly oppose her but secretly live lives contrary to her wishes; that her father has secretly drunk intoxicating liquors and has three times been discharged from his job as a conductor with the railroad as a result thereof, and that after one of those discharges he took a cure for that habit at a sanitarium in Denver; that her own marriage troubles have been largely brought about because she was afraid to take her mother into her confidence or openly oppose her mother's wishes; that her younger sister has had some marital difficulties for the same reason; and that her younger brother while attending high school, secretly married a girl who bore him a child, and when her mother learned of this she caused an annulment suit to be commenced and when that failed, she kept at him until she was finally able to break up the marriage. For these reasons she urges that it will be for the best interest and welfare of the children for them to be placed in her custody.

Virginia further contends that in cases of this kind, while the welfare of the children is the primary consideration, there is a presumption that the children's welfare will be best subserved under the care, custody and control of their natural parents and that therefore the courts will not deprive such parents of the custody of their children unless

it is made to appear that such parents have in some manner surrendered such right of custody or that such parents are morally unfit to have the custody of their children or are unable to support them. She urges that she has not surrendered the right to the custody of these children to the defendants; that Marilyn has never lived in her grandparent's home except during the time that she herself was living with her parents; and that while Bobby has lived with her parents most of the time, his stay with them was only temporary and that she has never agreed to or intended to surrender him to them permanently. She further urges that the evidence does not justify a finding that she is morally unfit to have the custody of her children or that she is unable to support them.

We do not find that Virginia is morally unfit to have the custody of these children or that she is unable to support them. This does not mean that she is as fit morally or that she can support these children as well as the defendants, those questions will be later discussed in connection with the question of what is for the best interests and welfare of the children. There is no evidence to justify a holding that Virginia has, by allowing Marilyn to live with the defendants, surrendered her right to have Marilyn's custody and control. Thus if the law is as she contends at least Marilyn must be awarded to her mother even though we should determine that it would be for her best interest to be awarded to the defendants. It is therefore necessary for us to determine what the law is in this respect.

Under the English common law, originally, the writ of habeas corpus was used only in cases of arrest or forceable restraint under claim of authority of law. Later it was broadened to cover all kinds of cases where one person forceably restrained another of his liberty ▮ whether under claim of authority of law or not and in cases where the restraint was such that the person restrained was unable to make application in person for the writ, other persons were allowed to do so in his behalf and this applied in cases of children as well as adults. In all

of these cases originally, at least in theory, if the court found that there was unlawful restraint, it merely ordered the person freed from the restraint. But in cases of small children unable to exercise mature judgment in such matters, who are always the wards of someone, they were held to be the wards of courts of equity, and such courts tried out the question, usually, of which of two contending parties should have the custody of the child. In so doing, courts of equity, as the sovereign power exercising the king's conscience, made the choice for the child, and placed the child in the custody of the person where its best interests and welfare would be subserved. This jurisdiction of equity had developed long before the American revolution. In *re Barry*, 2 Cir., 42 F. 113, also reprinted in full at 136 U. S. 597, 34 L. Ed. 503, 14 Columbia Law Review 77 and 78, 56 Central Law Journal 385. This jurisdiction has been followed in the states and it is held generally that the determining factor is the best interests and welfare of the child. 39 C. J. S., Habeas Corpus, § 41, b, p. 572 and 573; 43 C. J. S., Infants, § 7, b, (1), p. 56 and 57; 25 Am. Jur. 204 to 206, "Habeas Corpus," Sec. 80.

All of our decisions recognize the general rule that the welfare of the child is controlling. However, we have repeatedly held that there is a presumption that it will be for the best interest and welfare of the child to be raised under the care, custody and control of its natural parents. Such a presumption is recognized by most courts, but there it little uniformity in the weight and effect which various courts give to such presumption. The effect to be given to this presumption will be the determining factor in the disposition of Marilyn; it is therefore necessary for us to determine the exact effect to be given thereto.

In *Harrison* v. *Harker*, 44 Utah 541, at page 566, 142 P. 716 at page 725, Mr. Justice Straup in a concurring opinion said:

"* * * Much is said concerning the law of the case, and that the welfare of the child is of primary consideration. The doctrine, when properly understood and applied, may be conceded. The presumption is

that parents are fit and suitable to be intrusted with the care and custody of their child, and that its interests and welfare are best subserved under their care and control. Before their legal right to its custody will be denied or invaded by the court, I think it must be made to appear that they in some manner have legally surrendered or forfeited such right or abandoned the child, or are morally unfit to have its custody, or are unable to properly provide for it in their own style and station in life. So when it is said that in determining a disputed custody of a child the primary consideration is its welfare, such statement should be considered in connection with the above propositions. For I do not think any one will seriously contend that, as against a stranger, a parent's legal right to the custody of his child will be denied him where an abandonment or a forfeiture, or laches, or a legal surrender, or unfitness, or inability of the parent is not clearly shown. That is, the legal right of a fit and suitable parent to the custody of his child will not be denied him as against an opposing claimant himself without a legal right to the custody of the child, though the latter may be able to show that it is to the best interest of the child to leave it with or award it to him. * * *"

As stated above this was in a concurring opinion not concurred in by any other justice. The court then consisted of only three justices. Mr. Justice Frick wrote the main opinion, in which he definitely argued that the best interests of the child would be subserved by placing it with its natural parent under the facts of that case. The child was awarded to the natural parents. Had Mr. Justice Frick logically adhered to the doctrine as stated by Mrs. Justice Straup all that it would have been necessary to do would have been to point out that the natural parents had not surrendered the right of custody, and were not shown to be morally unfit to have its custody, and that they were not unable to support it. Thus it would seem that this case holds that even under these facts the best interests of the child can be shown by direct evidence on that question and that it is not conclusively presumed to be for its best interest to be reared by its natural parent. Mr. Justice McCarty wrote a vigorous seventy-five page dissent. It is interesting to note that in the only two cases involving the question of the custody of a child on appeal from the district court, which this court considered prior to *Harrison* v. *Harker*, supra,

the child in each case was taken from the parent, and Mr. Justice Straup dissented, contending that the child should not be taken from the natural parent unless the parent was found unfit to have its custody. *Stanford* v. *Gray*, 42 Utah 228, 129 P. 423, Ann. Cas. 1916A, 989; *Hummel* v. *Parrish*, 43 Utah 373, 134 P. 898; But the other two justices held that the natural parent in each case had legally surrendered her right to the custody of the child and in such circumstances the best interests and welfare was the determining factor.

In *Jones* v. *Moore*, 61 Utah 383, 213 P. 191, Mr. Justice Frick wrote the opinion of the court which was concurred in by all the other justices, the number thereof having been increased to five at that time, and Mr. Justice Straup was then not a member of the court. That opinion quotes most of the above-quoted portion of Mr. Justice Straup's opinion in *Harrison* v. *Harker*, supra, and stated that the law to that effect is well settled in this jurisdiction. It then held that the natural parent had not in any manner surrendered his legal right to the custody of the child, and that it appeared that he was morally fit to have its custody and able to support it. But instead of presuming from these facts that it was for the best interests of the child to be in the custody of its natural parent in accordance with the rule in the Harker case, the court proceeded to demonstrate from the evidence that it was in fact for the best interest and welfare of the child to be placed in the custody of such parent.

In *Jensen* v. *Earley*, 63 Utah 604, 228 P. 217, 219, we again awarded the child to the natural parent. Mr. Justice Frick again wrote the opinion of the court, which was concurred in by all of the justices participating therein. Again the rule herein quoted from *Harrison* v. *Harker* was quoted with approval, and the conclusion reached that the natural parent was not shown to be morally unfit to have the custody of her child or to be unable to support it, and that she had not in any manner surrendered her legal right to its custody. The court concluded from those facts that there was a presumption of law that it would

be for the best interest and welfare of the child to be reared under the care, custody and control of its natural parent and that other evidence on that question should not be considered. In this regard the court said:

"* * * It should also be stated that in view of the state of the evidence in this case, the question of the best interests of the infant does not arise as a question of fact, but rather as a question of law. Here both parties are morally and physically fit to have the care and custody of the infant. * * *

"Nor, in view that the testimony is conclusive that the plaintiff (the natural parent) is, morally, a fit person to have the care and custody of her child and that her parents are likewise fit, and are financially able and willing to take care of it, is the mere fact that the plaintiff is unmarried of great importance in this case. All the authorities are to be the effect that her legal rights are not impaired by that fact. Her unmarried state may, however, have a bearing upon the question of the best interests of the child, and of her moral fitness. As indicated, however, that question is not involved in this case."

Thus the court squarely held, in accordance with the rule from *Harrison* v. *Harker,* supra, that where the natural parent is morally fit to have the custody of her child and is able to support it, and has not in any manner surrendered her legal right thereto, a presumption of law arises that it will be for the best interest and welfare of the child to be reared under the care, custody and control of its natural parent, and this presumption cannot be overcome by other direct evidence on that question.

However, in *Sherry* v. *Doyle,* 68 Utah 74, 249 P. 250, 48 A. L. R. 131, the same question was again before the court. Mr. Justice Straup, the author of the rule above quoted from *Harrison* v. *Harker,* supra, was again a member of the court, and wrote the prevailing opinion which was concurred in by all of the justices who participated in *Jensen* v. *Earley,* supra. The opinion quotes the above-quoted rule from *Harrison* v. *Harker,* supra, and from *Jensen* v. *Earley,* supra, and concluded that the natural father was morally fit, able to support, and had not in any manner surrendered his legal right to the custody of his child. However, instead of concluding as it did in *Jensen* v. *Earley,*

that from those facts a presumption of law arose that it was for the best interest and welfare of the child to be reared under the custody of the natural parent, it discussed the direct evidence on that question at length and concluded therefrom that it was for the best interest and welfare of the child to be awarded to its natural parent. No one seems to have noticed that under the rule above quoted from *Harrison* v. *Harker*, supra, and the direct holding in *Jensen* v. *Earley*, supra, under the facts here established a presumption of law arose that it would be for the best interest of the child to be awarded to its natural parent if fit, which could not be overcome by other direct evidence on that question. Mr. Justice Frick, the author of the opinion in *Jensen* v. *Earley*, supra, seemed to have held views in this case entirely contrary to the holding therein which were expressed as follows [68 Utah 74, 249 P. 254]:

"I was strongly of the impression that the judgment should be reversed and the child awarded to the defendant Esther Doyle, for the reason that the plaintiff, although the father, had no home, nor any prospects of ever having one, and had no friends or relatives to whom he could entrust the care of the infant. In view, however, that my associates are all of the opinion that the child should remain with the father, I yield to their judgment."

In this comment no claim was made that the necessary facts on which the presumption in *Jensen* v. *Earley*, supra, were based were here lacking. He, however, did not base his concurrence on the presumption but merely yielded his own judgment to that of his associates. Thus he clearly indicated that in this case he considered the presumption could be rebutted by direct evidence.

There are other Utah cases involving the custody of children between a parent and some other person, on appeal from the decision of a district court, usually in habeas corpus cases. However, none of these cases throw any light on the question now under discussion, because in each of them the court found that the parent either by agreement or conduct had surrendered its right to the custody

of the child, and that under such circumstances the court must determine what will be for the best interests and welfare of the child. With this rule the herein quoted rule from *Harrison* v. *Harker*, supra, and the decision in *Jensen* v. *Earley*, supra, agree. *Farmer* v. *Christensen*, 55 Utah 1, 183 P. 328; *Kurttz* v. *Christensen*, 61 Utah 1, 209 P. 340; *Wallick* v. *Vance*, 76 Utah 209, 289 P. 103; *Flora* v. *Flora*, 84 Utah 143, 29 P. 2d 498.

We conclude that the determining consideration in cases of this kind is: What will be for the best interest and welfare of the child? That in determining this question there is a presumption that it will be for the best interest and welfare of the child to be reared under the care, custody and control of its natural parent; that this presumption is not overcome unless from all of the evidence the trier of the facts is satisfied that the welfare of the child requires that it be awarded to someone other than its natural parent. Thus the ultimate burden of proof on this question is always in favor of the parent and against the other person.

In addition thereto this presumption, being based on logic and natural inference, should be kept in mind by the trier of the facts and weighed and considered with all the other evidence in determining this question. The common experience of mankind teaches "that blood is thicker than water," that usually there is a much stronger attachment between a natural parent and child than is developed between the child and a foster parent, that ordinarily the natural parent is willing to sacrifice its own interest and welfare for the benefit of the child much more than is the case with foster parents and that generally the natural parent is more sympathetic and understanding and better able to get the confidence and love of its own child than any one else, all of these things are especially true of the natural mother. That these facts should always be kept in mind throughout the trial and given due weight along with all the other evidence in the case in determining what will be for the best interest and welfare of the child. However,

this presumption is one of fact and not of law, and may be overcome by any competent evidence which is sufficient to satisfy a reasonable mind thereon.

We are satisfied that this is the rule which has been followed in this court in all of our cases except *Jensen* v. *Earley,* supra, notwithstanding the language to the contrary above quoted from *Harrison* v. *Harker,* supra. To the extent that *Jensen* v. *Earley* holds to the contrary it is hereby expressly overruled. This rule is sustained by the great weight of authority in this country and we think by the better reasoning. In addition to the cases and texts above cited see: *Brown* v. *Brown,* 2 Ala. App. 461, 56 So. 589; *Radicke* v. *Radicke,* Tex. Civ. App., 206 S. W. 964; *Larson* v. *Wellner,* 97 Or. 513, 191 P. 671; *McKercher* v. *Green,* 13 Colo. App. 270, 58 P. 406; *People ex rel. Beaudoin* v. *Beaudoin,* 126 App. Div. 505, 110 N. Y. S. 592, affirmed in 193 N. Y. 611, 86 N. E. 1129; also note to *Sherry* v. *Doyle,* 68 Utah 74, 249 P. 250, 48 A. L. R. 131, note commencing at 48 A. L. R. 137.

By Sec. 14-7-31, U. C. A. 1943, the legislature has established the policy of this state to be in harmony with this holding, in the law governing juvenile courts, which provides:

"No child * * * shall be taken from the custody of its parents, * * * without the consent of such parents * * * unless the court shall find from all the circumstances in the case that * * * the welfare of a child requires that his custody be taken from its parents * * *."

There are other grounds enumerated in the statute which are not here quoted, which have no bearing on our present problem. While this section is not binding in a case tried in the district court, it does establish the policy of the law in the juvenile courts to be in harmony with our holdings above.

As before stated this is an equity case. *Harrison* v. *Harker,* supra; *Jones* v. *Moore,* supra; *Jensen* v. *Earley,* supra;

*Wallick* v. *Vance,* supra; *In re Barry,* supra. It is therefore our duty to carefully examine the record and make an independent determination of what the facts are. In so doing we should keep in mind that the trial judge saw and heard the witnesses and observed their demeanor and was acquainted with the circumstances surrounding the giving of their testimony, and therefore was in a better position than we are to weigh and evaluate their evidence. *Stanley* v. *Stanley,* 97 Utah 520, 94 P. 2d 465, concurring opinion of Mr. Justice Wolfe commencing at page 527 of 97 Utah, 94 P. 2d 465.

The findings of the court are very general and are in the nature of conclusions from other facts. The vital facts on which there is a conflict in the evidence and which are determinative of this case were not determined by the court in its findings of fact. For instance the court found that Virginia is a good mother, that she never abandoned these children, that she is a fit person to have their custody, that it will be to their best interest to be raised by their mother with their mother's love, and where they can be together and with their other brothers and sister, and that during the last eight months she has lived a clean, honorable and circumspect life. There is no finding on whether Virginia drinks or becomes intoricated, or whether she associates with men other than her husband, or whether she frequents beer halls, to the neglect of these children. We are not suggesting that the findings are not sufficient to sustain the judgment, we merely point out that we do not have the benefit of the court's opinion from the findings of fact on the determinative evidentiary facts of this case. At the end of the trial, however, the court made an oral statement in which some of these facts were discussed, during the course of which the court made the following statements:

"I think Virginia is a good mother. * * * I think she drinks. I think she drinks too much, and I think when she is drinking she is not a good mother. I think Vince drinks * * *."

"If Virginia and Vince are going to raise a family they have got to know that they cannot be partying. Those things just don't go together.   *   *   *"

"I think there has been some neglect but I think it was while drinking was taking place  *   *   *."

These statements seem to indicate that the trial judge thought that Virginia drank to excess and as a result thereof the children had been neglected.

The evidence is conclusive that both Virginia and her present husband from the time of their marriage to about eight months prior to the trial of this case, habitually drank to excess and often became intoxicated. On such occasions Marilyn was many times not only neglected but had the responsibility of caring for the younger children, and this conduct also resulted in the usual coming home late at nights with loud and boisterous talk and quarreling, and often a hangover the next morning during which period there was no one to care for the children. Such a home certainly is not a good place to raise children. There is little dispute on this question in the evidence. Virginia herself freely admitted and her counsel stipulated that she drinks, but insist that she never drinks to excess or becomes intoxicated. However, some of her own witnesses testified that they had seen her drunk, the defendants, her father and mother each testified of numerous occasions when she was definitely intoxicated, and was neglecting the children as did other witnesses. There were two witnesses, one a daughter of her previous landlady, and the other the wife of the proprietor of the hotel where Virginia lived for about a year and a half, who certainly had the opportunity to know, each testified as to a different period of time, and each period was in excess of a year, that regularly during that period Virginia and her husband had become intoxicated almost every week end, and they described definite occasions when Marilyn was neglected. The great preponderance of the evidence is undoubtedly to this effect and we so find.

As to the eight month period immediately preceding the trial, the trial judge found that during that period she lived a clean, honorable and circumspect life. If this is to be enterpreted as meaning that during that time she had reformed and discontinued drinking it is not supported by the preponderance of the evidence. There is no testimony in the record that there was any change in her living during that period. She herself did not so claim. Her claim was that she did not need to make any change in her mode of living. While there was no testimony that she drank during that time, this is readily accounted for from the fact that the defendants did not go near her nor have other witnesses who visited her during that period. Also there were no disinterested witnesses whose testimony covered that period who were in a position to know whether she drank or not. A preponderance of the evidence does not justify a finding that she substantially changed her habits of drink for the better during that period.

Virginia's marriage experience and manner of living shows instability which would not be beneficial to the children. She has had three husbands, with two of whom she lived not to exceed a period of about a year each. Since marrying her present husband she has contemplated divorcing him and remarrying a previous one. The incident of the auto tourist camp, under her own version thereof, shows at least instability and conduct not becoming a mother. As far as her words or actions have shown she has not desired to have Bobby live with her since she left him with his grandparents practically all of the time while she was married to Mr. Wheat, and all of the time she has been married to her present husband except the time she lived on Kensington avenue.

The only real home that Bobby has known is the home of the defendants, and Marilyn has lived there much of her life. Both are attached and adjusted to the home life of the defendants, and the defendants are very much attached to them. These children are more attached to the defendants than to their own mother. This was demonstrated by

Marilyn on the last night when her mother left the defendants' home. As she left Virginia asked Marilyn if she was not coming but Marilyn did not go with her. At that time her grandmother had no opportunity to teach her to make that choice because Marilyn had been living with her mother. Again when Virginia attempted to take the children by force both resisted her. Twice during the trial each when questioned privately by the trial judge chose to go to their grandparents. It is claimed that this was because the grandmother had so taught them but we doubt that they could be taught to make a choice which was against their own desires. The trial court found that their grandmother had been overindulgent with them and thereby induced them to so choose. However, the record is devoid of any testimony to that effect.

On the other hand there is testimony that Virginia when sober is a good mother and that notwithstanding her drinking habits she has successfully brought two sickly younger children through the critical first years of their life and that generally she keeps her home as clean as the ordinary home.

The financial status of the two families are all in favor of the defendants. Mr. Coffman earns much more than Mr. Walton, has a better home, more property, and fewer dependents. We mention this merely incidentally as we do not consider it the controlling factor or of great weight in this case.

There is no doubt but that both Mr. and Mrs. Coffman are devout, conscientious and stable people, and are very attached to and interested in the welfare of these children. Mrs. Coffman never drinks liquor, she is very clean and tidy in her home and her care of these children, whom she gives the best of personal attention. Virginia, however, urges that the defendants have not been a great success in raising their own family. And it must be admitted that in the case of Virginia much could be desired, and that the incident of her brother's unfortunate marriage and divorce is not to be referred to with pride. As to Mr. Coffman he

has clearly demonstrated a keen interest in the welfare of these children, by his many visits to Virginia's home and his attention to their welfare. Although the trial court in its oral statement indicated that he considered him a teetotaler, the evidence on his habits of drink is not entirely satisfactory. We have previously indicated what Virginia contends in this regard. The railroad records show three discharges from his job as a conductor and none is shown to be on account of drink. Virginia testified that drink was really the cause in spite of the record, and that after one of them he took a cure for that habit at a sanitarium in Denver. There was some other evidence of occasional intoxication on his part. At first on cross-examination he positively denied all these charges, later he admitted taking a rest cure at a sanitarium in Denver and some other things which he had previously denied, and he seemed to have a convenient memory on a number of things. At most this evidence merely shows an occasional intoxication with long periods of up to a year or more in between. There was no evidence of intoxication around the home or that would in any way interfere with the care of these children.

We feel strongly that these two children should not be separated, that it would be very much against their interests and welfare for Bobby to be awarded to his grandparents and Marilyn to her mother. Under those circumstances he would be raised without other children companions in the home and she would be a lone stepchild to the husband in her mother's home. She being much older than the other children under those circumstances would no doubt get much of the work and drudgery in that home, and if the mother continued to drink as she has, much of the responsibility that should be the mother's would undoubtedly fall on her. We therefore definitely feel that these children should not be separated.

In weighing the questions in this case we fully realize the importance of our decision in the lives of these children and also in the life of their mother, and we have not reached

our decision without careful consideration and much hesitation. We are, however, firmly of the opinion that the interests and welfare of these children require that they be both awarded to their grandparents, the the defendants herein, that at all times the mother must be allowed to visit with them.

This does not mean that this is a permanent award of the children to their grandparents until they reach their majority. If conditions change so that it will be to their best interest and welfare to be placed in the custody of their mother then there is nothing to prevent her from instituting another action to obtain their custody. We confidently believe that if conditions do change so that it will be to the best interest of the children to be in the custody of the mother that the defendants, who are the mother's parents, will be willing without further legal proceedings to surrender them up to her.

The decision of the district court is reversed with directions to enter findings of fact and conclusions of law and judgment in accordance with the views herein expressed. Parties to bear their own costs.

McDONOUGH and WOLFE, JJ., concur.

LARSON, Chief Justice.

I dissent. I am unable to accede to either the conclusions as to the facts or the propositions of law laid down in the prevailing opinion. The law governing the legal questions here presented has been stated and reiterated by this court so often it should need no further discussions. The prevailing opinion attempts to analyze and draw conclusions therefrom which I think wholly at variance with plain wording of the opinions.

In *Harrison* v. *Harker*, 44 Utah 541, at page 566, 142 P. 716, at page 725, Mr. Justice Straup in a concurring opinion states the law in the quotation cited and quoted by Mr. Justice Wade. In the prevailing opinion in the present case Mr. Justice Wade then argues that the court did not

approve the statement by Mr. Justice Straup, because Mr. Justice Frick argued the best interests of the child was subserved by placing it with its natural parent. We submit a perusal of that opinion does not justify the construction of its holdings made in the prevailing opinion. It then seeks to draw some satisfaction from the fact that Mr. Justice Straup dissented from the opinions in *Stanford* v. *Gray,* 42 Utah 228, 129 P. 423, Ann. Cas. 1916A, 989; and *Hummel* v. *Parrish,* 43 Utah 373, 134 P. 898, both written before the *Harrison* v. *Harker case,* supra, wherein the other justices held that the natural parents had legally surrendered his right to the care of the child and therefore the best interests of the child became the determining factor. That is one of the bases laid down by Mr. Justice Straup in the Harrison case as justifying an examination unto the best interest of the child. The dissent by Mr. Justice Straup was not upon that rule of law but upon the question as to whether the mother had legally surrendered her right to custody. Those cases, therefore, like the Harrison case, support the rule laid down by Mr. Justice Straup.

In *Jones* v. *Moore,* 61 Utah 383, 213 P. 191, Mr. Justice Frick, upon whose utterance the author of the prevailing opinion mainly relies, after quoting the rule from the Harrison case, as the law in this jurisdiction, says the same thought is expressed in *Stanford* v. *Gray,* supra, and *Farmer* v. *Christensen,* 55 Utah 1, 183 P. 328, adding [61 Utah 383, 213 P. 194]:

"* * * *where there is a question* respecting the parent's *moral fitness, or where* by his conduct or acts he has *forfeited or lost* his *legal right to custody* as a parent, or *has abandoned* the child, but desires to reclaim its custody, the best interests of the child is held to be the controlling or determining factor in the case." (italics added.)

On the next page, 390 of 61 Utah, and at page 194 of 213 P., Mr. Justice Frick says:

"The questions, therefore, are: First, has the plaintiff by anything that he has either said or done forfeited or lost his primary right as a parent to have the custody and control of his child? and second, is

he morally unfit to have the care, custody, control, and education of his child, or is he entirely without means to support the child, and for that reason it is in danger of becoming a public charge—that is, a mere pauper?"

Mr. Justice Straup was not on the bench at the time. All five justices concurred. In *Sherry* v. *Doyle,* 68 Utah 74, 249 P. 250, 253, 48 A. L. R. 131, all five justices concurring therein, this court said:

"We thus have a situation where the plaintiff has shown a clear legal right to the custody of the child, and where the defendants have shown no legal right whatever. No one claims to the contrary. No abandonment or forfeiture or laches or legal surrender or unfitness or inability on the part of the plaintiff was either alleged or shown. We thus think the legal right of a fit and suitable parent to the custody of his child ought not to be denied him as against an opposing claimant, himself without a legal right to its custody.

\*    \*    \*    \*    \*    \*·

"Unless the plaintiff is immoral or unfit, such association and companionship of the father and the child is the right of both and ought not to be denied to either. The comforts and benefits of such an association with one of the child's own flesh and blood usually are far more advantageous than an association with strangers.

\*    \*    \*    \*    \*    \*

"In *Jensen* v. *Earley,* this was quoted and approved from the case of *Hummel* v. *Parrish,* 43 Utah [373], 382, 134 P. 898:

" 'The legal presumption is that it is for the best interests of the child and of society for the child to remain with its natural parents during the period of its minority and be maintained, cared for, and educated by them and under their supervision and direction.' "

I find no cases in this jurisdiction to the contrary, and there are none cited in the prevailing opinion. I find nothing in this record to call for any modification of the doctrine and rules which have been the constant practice of this court throughout its history.

Now a comment as to the facts. It is conceded that the mother is morally fit to rear the children, that she is able and competent to do so, and there is no apparent danger of them becoming public charges if left with their mother.

It is only contended that she drinks some, and that she likes men. May I ask the questions: Is any woman who dislikes men fit to rear children? Is it for the best interests of little children of a coming generation to press their tender pliable minds and natures into the mould of two generations ago? As pointed out in the prevailing opinion, the grandmother is a strong domineering woman who had aroused antagonism in her own children because of her inflexible desire to make all lines conform to her concepts and will. The proof of the pudding is in the eating; the story told in the prevailing opinion as to the success (?) of the grandparents in rearing one family is at least enough to make you perk up your head and wonder.

There is another reason I cannot concur in the opinion. I expressly disavow the thought that what I say hereafter is in the mind of Mr. Justice Wade or any of my other associates, but "tall oaks from little acorns grow," and the principle laid down opens the door to the philosophy and practice indicated in what follows.

I cannot subscribe to what I think unintentionally underlies the philosophy or reasoning of that opinion. I deny the right of the state to set itself up as a substitute for the family unit; to arrogate to itself the right and power to rear children, and prescribe all the thoughts and developments of the children within its border. The world has just witnessed the debacle that can be produced by two nations devoted to the philosophy that children are wards and rights of the state, and not of the parents. Why I ask should a judge, or a majority of the justices for that matter, be deemed blessed with such superior wisdom about the rearing of children that he can say just what is best for every child when he knows nothing of the heredity or background which gives them life? Whereof is the wisdom born which leads one to say that a child will be a better person if stripped of the pride of ancestry; rendered for all practical purposes, nullius filius; and made to grow up devoid of the right to say "my father" or "my mother?" Why should one man have the power or right to require other people

to grow according to the mould into which he perhaps misshapes the character of his own children? A mother's worries, cares, caresses, tears and prayers are stimulating and potent reclaiming agencies in the lives of all of us. The sense of obligation and devotion to those who gave us being is a different feeling from that felt towards one who gives us shelter. When you take a child away from the consciousness of its parentage you remove one of its basic assets in character building.

When the state steps in and interfers with the ways of nature, the result is generally bad. To take from a mother or father the child they brought into being, is to rob them of the greatest balance staff, the strongest emotion, the supremest devotion life can ever know. We say a mother is morally fit to rear her children properly, yet because she does not fit her pleasures and relaxing moments into the mould from which we take ours, she shall be denied the right to rear her children. We strip her of the very things that could keep her as good as she is, or make her better. We rob her of the steadying hand that should guide the ark, and leave her on a ship without a rudder, alone on a wide, wide sea. Not because she is bad, not because she is unfit or unworthy, not because she is unable or incompetent, but because all of her social ideas and habits do not fit our "more righteous than thou" concepts of life. To want others to live according to our ideas is natural; to impose them upon others is tyrannical. I concede to the state no right or power to go beyond the principle laid down in the Harrison, the Moore and the Earley cases. I think the state has never sought to go any further. This I think is the fair import of Sec. 14-7-31, U. C. A. 1943, cited, and a tiny bit thereof quoted in the prevailing opinion. Because the opinion does violence to my conception of our statutes, our jurisprudence, and our basic philosophy of government and life, I must dissent.

PRATT, J., not participating.