342 P.2d 867

James L. BARKER, Jr., Trustee in the mat-
ter of George Ray Dunham, Voluntary
Bankrupt, Plaintiff and Appellant,

v.

George R. DUNHAM and Leoda S. Dunham,
his wife, Defendants and Respondents.

No. 9012.

Supreme Court of Utah.

July 28, 1959.

Donn E. Cassity and Jack L. Crellin, Salt
Lake City, for appellant.

Clyde & Mecham, Elliott Lee Pratt, Salt Lake City, for respondents.

WADE, Justice.

. James L. Barker, Jr., Trustee of the Estate of George R. Dunham, Voluntary Bankrupt, brings this action to set aside a warranty deed whereby Dunham conveyed to his wife, Leoda S. Dunham, about 59 acres of land, platted as Kamp Killkare Lots, located north of the Provo River, near Kamas, Utah. Plaintiff claims that this conveyance was without consideration and made to defraud the bankrupt's creditors.

Fred B. Garrett and Bruce R. Sizemore are the only creditors listed. Their claims grew out of an automobile collision on November 8, 1953, in which Dunham and the two creditors were severely injured. The creditors claim that the accident resulted from Dunham's negligence and brought suit to recover damages therefor. Dunham appeared by his counsel, LaMar Duncan, and stipulated judgment in favor of the two creditors in the total amount of $51,840 and costs. This conveyance left the bankrupt without assets.

The Dunhams purchased this property from Carrie N. Kirkpatrick. They took possession thereof about May 1, 1944, under a uniform real estate contract upon making a $1,000 down payment, with the balance to be paid in forty-dollar monthly instalments. The uniform real estate contract was between Mr. Dunham and Mrs. Kirkpatrick. Mrs. Dunham was not named as a party thereto. Thereafter on January 6, 1951, the Dunhams borrowed enough money from the Coalville Bank through a mortgage on this property to pay the balance of the purchase price to Kirkpatrick. On that day they received a warranty deed conveying the property to "George R. Dunham, and Leoda S. Dunham, his wife, as joint tenants with full rights of survivorship, and not as tenants in common." On November 27, 1953, just 19 days after the accident in which the creditors were injured, there was recorded in the Summit County Recorder's Office, the deed in question wherein George R. Dunham conveyed to Leoda S. Dunham, his wife, the Kamp Killkare property. This deed is dated November 1, 1952. It is witnessed by LaMar Duncan who acted as Mr. Dunham's attorney in the litigation between him and the creditors.

The trial court found that the deed was made on the date it bears, and that Mrs. Dunham, having paid out of her own funds all of the purchase price thereof, was the sole owner of the property regardless of the deed, and that therefore there was consideration for the deed. The plaintiff appeals from this decision, claiming that these findings are clearly against the weight of the evidence. He asks this court to review the evidence and reverse

the judgment on the facts, as we have authority to do in equity cases. In such cases we review the evidence, keeping in mind that the trial court heard and saw the witnesses, and reverse if we conclude that the evidence clearly preponderates against the decision.[1] The appellant has an additional burden in this case to prove a fraudulent conveyance, which requires clear and convincing evidence.

■ The only evidence that Mrs. Dunham paid for this property out of her own separate funds is the uncorroborated testimony of Mr. and Mrs. Dunham, who are vitally interested in trying to save his interest in the property for themselves. The other facts and circumstances tend to refute this claim.

The Dunhams were married March 13, 1919, shortly after his discharge from World War I, Army, and more than 39 years before this trial, on November 17, 1958. At the time of the trial he was 62 and she was 55 years old. Shortly after the marriage he went to work in the coal mines and continued such employment until four or five years before September 2, 1942, when they both took employment with the Union Pacific Railroad Company as cooks. During the intervening four or five years he worked at odd jobs and sometimes she worked, but she was never gainfully employed while he worked at the mines. During that time his wages were the sole support of the family. Her wages from the railroad were approximately $200 and his approximately $250 per month. They contracted to purchase and took possession of this property May 1, 1944, at which time she received more than $700 and he received more than $800 back pay from the Union Pacific in a settlement of a labor dispute. For a few years thereafter they both returned to their old jobs with the railroad during the winter months. Although both of them insisted that he spent all of his money on drink they agreed that he never lost any time from his work on that account, and that he worked right along with her in the operation of this place. They have no children, but her mother lived with them at the time of the trial. All of these facts suggest that for about 18 years he supported the family by his own earnings, and then for four or five years he worked at odd jobs during which time she sometimes worked, and they both worked at the railroad, he receiving more wages than she, and finally, they operated this property together. It certainly does not suggest that she bought and paid for the property out of her own money,

1. See Article VIII, Section 9, Utah Constitution. " * * * In equity cases the appeal may be on questions of both law and fact; * * * ". Also Walton v. Coffman, 110 Utah 1, 169 P.2d 97; Peterson v. Peterson, 112 Utah 554, 190 P.2d 135; Nokes v. Continental M. & M. Co., 6 Utah 2d 177, 308 P.2d 954.

while he laid around and drank up all of his wages.

There are other facts which much more definitely suggest that he was a part owner of this property. They both admit that the contract with Mrs. Kirkpatrick to purchase the property was made in his name alone and her name did not appear as a party thereto. The deed from Mrs. Kirkpatrick was made to the two of them with his name first. From November 5, 1952, to November 27, 1953, the day when the deed from him to her was recorded, eight deeds conveying various lots of this property were executed by both husband and wife, with his name first on each deed. The same is true of a mortgage to the Kamas State Bank dated October 26, 1953, and recorded November 10, 1953, and the plat of Kamp Killkare was made September 25, 1952 and recorded October 22, 1953, at the request of E. T. Ralph, former County Surveyor, for Mr. Dunham. It is conceded that all of these sales were largely negotiated by him, and that he never suggested to any of the purchasers that she was the owner of the property. Thus all of their dealing with this property definitely indicated that he was at least an equal owner with her in this property.

On the question of when the deed conveying this property from Mr. Dunham to his wife was made, a great preponderance of the evidence is that although it is dated November 1, 1952, more than a year before the accident occurred in which the creditors were injured, it was actually made after that accident.

A very strong reason for believing that the deed was made after the accident and not at the time it is dated is the fact that there is no reason whatever shown for making such a deed at the time it was dated. This is equally true whether or not her claim is correct that she paid for the property out of her own separate funds. For until the accident in which the creditors were injured occurred there was no reason for making the transfer and none has been suggested. She testified that although she paid for the property out of her own separate funds, she had it conveyed to her and her husband jointly because (1) she had ulcers of the stomach and if anything happened to her she wanted him to get the property; (2) it is customary for husband and wife to hold their property as joint tenants; and (3) she had no head for real estate so she turned it over to him, and the fact that he was drinking heavily at that time gave her no concern. The fact that she said she placed the property in joint tenancy so he would get it if anything happened to her indicates that she knew that the survivor of joint tenants would get the property on the death of the other. If his heavy drinking was no concern to her, and she felt it safe to put her property in joint tenancy with him, then there was no reason to have him

deed the property back to her merely because he had a heart attack. Because if he died, she knew that as a joint tenant she would become the sole owner of the property upon his death. The only excuse she gives for making this deed was her fear that he would have a heart attack and die. She does not claim that she had any fear that his drinking might cause an accident and make him liable to creditors, or that he might wrongfully encumber the property. So under her own understanding of joint tenancy there was no occasion whatever for making the deed to her at that time.

Mrs. Dunham and Mr. Duncan, her lawyer who made the deed, claim that the deed was executed in his office on the date it bears in the presence of each of them and of Mr. Dunham and Mr. Duncan's mother, who was working in the office. But neither of the last two persons so testified. Mr. Duncan's mother was not called as a witness. Mr. Dunham, amid a profusion of claims that he did not remember, finally says he had a heart attack in 1952, and he deeded this property to his wife but gave no details as to when and where the deed was made. Then in answer to the question: " * * * Isn't it true that Mr. Duncan brought this (the deed) to you in November of 1953, when you were in the Veterans' hospital after the accident that you had when you injured yourself and Mr. Sizemore and Mr. Garrett? * * * Isn't that the place and the time that you signed this document * * * ?" He said: "It could very well be."

There are other circumstances which cast doubt that this deed was executed before the accident occurred in which the creditors were injured. We will merely mention a few of them. The deed in question was prepared and acknowledged by Mr. Duncan, the attorney who represented Mr. Dunham in the litigation between him and the creditors. Although the Dunhams made many deeds, a plat of Kamp Killkare, and a mortgage or two, none of these other instruments were drawn by an attorney. All of them were simply drawn by some officer in the bank where they were dealing. Mrs. Dunham and Mr. Duncan both claim that he was not told that the property was held by Mr. and Mrs. Dunham as joint tenants. But Mr. Duncan volunteered that "as far as my own practice is concerned, it wouldn't make any difference. I personally don't like joint tenancy." Mrs. Dunham testified that they did not ask Mr. Duncan's advice on the matter of making this transfer. They simply had him draw the instrument in accordance with their request. Mr. Duncan testified that he probably told them to have the deed recorded immediately. The deed was not recorded until after the accident and no reason except being busy was given for the failure to record before the accident and recording so soon thereafter. While none

of these incidents standing alone are strong proof that the deed was not made until after the accident, they do all fit into a pattern which is certainly consistent with an attempt on the part of the Dunhams, in collaboration with Mr. Duncan, to defraud Mr. Dunham's creditors.

Two other claims in favor of the Dunhams on this question should be considered. Mr. Lefler, cashier of the Kamas State Bank, testified that when he prepared a mortgage in favor of the bank dated October 26, 1953, less than two weeks before the accident, Mrs. Dunham told him that Mr. Dunham had already deeded this property to her. This mortgage was in the name of both Mr. and Mrs. Dunham with his name first. Shortly after the deed from Mr. Dunham to Mrs. Dunham was recorded on November 27, 1953, another mortgage was made by the Dunhams to the bank dated April 12, 1954. In this mortgage her name is first and only Mrs. Dunham signed this mortgage. No reason whatever is given why the cashier of the bank took a mortgage from Mr. Dunham with his name appearing first on the mortgage at a time when he knew that he had deeded away all of his interest in the property. The actions of Mr. Lefler in not requiring that this deed be recorded and that the mortgage be made by the real owner is somewhat inconsistent and is therefore entitled to little credence. Also a Mr. Layton claims that in October of 1953, just shortly before the accident, while he was fishing with Mr. Dunham, Mr. Dunham told him that he was going to deed this property to his wife. This last statement, although given to support the testimony of the Dunhams that the deed was made long before it was recorded, is really against the Dunhams. For if he had then made the deed to his wife, he would have said that he had already made the deed, not that he was going to make it in the future. So we think that these statements are entitled to little weight as evidence that this deed was actually made prior to the accident wherein the creditors were injured.

From the foregoing we conclude that the great weight of the evidence in this case is clear and convincing that the deed from Mr. Dunham to his wife was made after the accident in which his creditors were injured, and that half of this property, which was thus conveyed, and which prior thereto was held in joint tenancy, belonged to the husband, and that this deed was therefore made to defraud his creditors and should be set aside.

Case is remanded for judgment in accordance with this opinion. Costs to appellant.

CROCKETT, C. J., and McDONOUGH and CALLISTER, JJ., concur.

HENRIOD, J., concurs in result.