ROWLEY v. PUBLIC SERVICE COMMISSION et al.

No. 6985. Decided October 15, 1947. (185 P. 2d 514.)

---

See 42 C. J. S. Motor Vehicles, sec. 114. Resort to constitutional or legislative debates, committee reports, journals, etc., as aid in construction of constitution or statute, see note, 70 A. L. R. 5. See, also, 50 Am. Jur. 204.

 

*Irwin Clawson,* of Salt Lake City, for plaintiff.

*S. N. Cornwall, Harry D. Pugsley,* and *Farnsworth & Van Cott,* all of Salt Lake City, and *Grover A. Giles,* Atty. Gen., and *Herbert F. Smart,* Asst. Atty. Gen., for defendants.

LATIMER, Justice.

Review of an order of defendant Commission denying plaintiff's application for a permit to operate as a contract motor carrier for a designated company over highways of this state.

The fact are relatively simple and, for the most part, not in dispute. On January 1, 1940, plaintiff was hauling (without permit or authorization from the Commission) certain personal property consisting generally of track materials, machinery, wire, lumber, furniture, scrap iron, cement, and lumber. He had hauled his cargo over U. S. Highway 91 from Logan to Cedar City; over U. S. Highway 50 between Provo and Price; over U. S. Highway 40 between Salt Lake City and Heber; over Utah Highway 10 between Huntington and Price; over Utah Highway 189 between its junction with U. S. Highway 91 and Coalville; over Utah Highway 56 between Cedar City and Medina; over Utah Highway 26 between Santaquin and Mammoth; over the highway between Eureka and Mercur by way of Cedar Valley, and over many others. Plaintiff has been hauling cargo irregularly since 1939, and during all of this time his hauling operations have been without authority of the Commission, and without compliance with the provisions of the Transportation by Motor Vehicle Acts.

On March 21, 1946, applicant filed an application with the Public Service Commission to operate as a contract carrier by motor vehicle for the transportation of steel rail, mining

machinery, scrap and various items of government surplus property, purchased by United Steel and Rail Company. The proposed highways to be used were from Salt Lake City to all points in Utah and return over irregular routes. Applicant at the hearing moved to amend his application so as to eliminate the restriction as to hauling supplies purchased from United Steel & Rail Company only, and to extend his application to permit hauling for everyone who might desire his services.

Without going into great detail, a summary of his evidence with regard to his operations indicates that, while hauling during the years 1939 and 1940, he had carried a variety of items for a limited number of individuals and concerns and for the most part these were not regular shippers; that his routes were irregular, his cargo was mixed and varied, the type of items carried being mostly war surplus property, and this was all-inclusive, even to the extent of including furniture and cattle; that he had no regular contracts of haulage, had no liability or property damage insurance, had no schedule on file, had no tariff on file, and hauled over any route for anybody who requested his services.

Applicant predicated his right to a permit on the so-called "grandfather" clause contained in Chapter 105, Laws of Utah 1945, which amended, among other sections, Section 76-5-21, U. C. A. 1943. The section as amended reads as follows insofar as pertinent to the position taken by plaintiff:

"It shall be unlawful for any contract motor carrier to operate as a carrier in intrastate commerce without having first obtained from the commission a permit therefor. The commission shall grant on application to any applicant who was a contract motor carrier as defined by this act on the 1st day of January 1940, a permit to operate as a contract motor carrier on the same highways and to carry on the same type of motor service as he was on said date. * * *"

Section 76-5-13, U. C. A. 1943, of the same act sets out the following definition:

" 'Contract Motor Carrier of Property' means any person engaged in the transportation by motor vehicle of property for hire and not included in the term common motor carrier of property as hereinbefore defined."

It is applicant's contention that the rights granted by the 1945 amendment were extended to all who were operating as contract motor carriers on the date specified in the act, and not merely to those legally operating (that is, operating under permit from defendant Commission or whose operations were theretofore exempt from the provisions of the act). Defendants, on the other hand, assert that the only purpose of the 1945 amendment was to grant a right to such permit to those who were not required to have a permit theretofore and hence were operating legally without one, but whose operations were by the amendment made subject to regulation by defendant Commission.

Applicant, in support of his position, argues that the language of the statute as amended is clear and unambiguous and hence that it is not subject to construction. He asserts that the words

"The Commission shall grant on application to any applicant who was a contract motor carrier as defined by this act on the first day of January, 1940, a permit to operate as a contract motor carrier on the same highways and to carry on the same type of motor service as he was on said date"

literally construed, include those operating without sanction, and that if construed in their context within the acts as amended, they likewise include him. Furthermore, he contends that such construction is in harmony with the history of antecedent legislation in this state regulating motor carrier service, it being his contention that "grandfather" rights were recognized by the legislative enactments of 1927, 1933 and 1935.

Defendants argue that departure from literal construction is dictated when we look to the purpose of the act and to that of its predecessor enactments and to that of comparable federal legislation, and by having in mind the other

amendments to the act made by the 1945 enactment. It is likewise dictated, they contend, by the incongruity of the legislature extending the regulatory field of the Commission and the penal provisions of the act and at the same time granting a premium for its previous violation.

For the purposes of this decision, it is not necessary to trace the history of this legislation through the years and determine whether or not each time the legislature changed or amended the provisions of earlier acts it intended to grant rights to those who were operating illegally. Prior to the 1933 Act the regulatory measures enacted by the legislature were general in nature and applied to all automobile companies for hire. Carriers were not classified such as "common," "contract," "interstate," or "intrastate," and many of the requirements and restrictions imposed by subsequent legislation were not dealt with. Control by the statutory commission then in existence had not been extended to close supervision, and many of the operators who were, by later acts, brought under control were free to operate without violating the law.

The Act of 1933, Chapter 53, is the first comprehensive act passed by the legislature, and this legislation classifies carriers, imposes regulations on each class and recognized the necessity of controlling and supervising a fast-growing part of the transportation business. Section 13 of this act provides as follows:

"It shall be unlawful for any contract motor carrier to operate as a carrier in intrastate commerce without first having obtained from the commission a permit therefor. The commission, upon the filing of an application for such permit, shall fix a time and place for hearing thereon and shall give the same notice as provided for in section 7 hereof. Before granting a permit to a contract motor carrier, the commission shall take into consideration the character of the highway over which said contract motor carrier proposes to operate, and the effect thereon, and upon the traveling public using the same and also other existing transportation facilities and whether or not there is any real necessity for the service proposed to be rendered, and if it appears from the evidence that the highway is, in the opinion of the commission, already unduly burdened with traffic and that additional traffic will unduly interfere with the traveling public, or

that the service furnished by the existing transportation facilities is reasonably adequate and that there is no real need for any additional transportation facilities, the commission shall not grant such permit. Upon application made therefor, without a hearing and the payment of a filing fee, the commission may grant a temporary permit authorizing a contract motor carrier to make a single or round trip, said temporary permit to expire in not to exceed five days; provided, however, that upon the filing of an application with the public utilities commission, and payment of all fees as provided by this act, each contract motor carrier, now operating, shall be granted a permit."

A literal reading of the last part of this section might support the contention of the applicant that it was intended to grant a permit to those carriers then operating on the highway either with or without a permit. Petitioner claims this interpretation is strengthened by Section 26 of the same act which provides that certificates and licenses previously issued by the Commission shall remain in effect. It being claimed that if the legislature validated all permits by Section 26, there was no necessity for enacting the proviso included in Section 13.

To adopt this construction of the 1933 Act would be to hold in effect that the legislature intended to accomplish an unreasonable if not absurd result. That is, to grant to those operators who were violating the law the same rights and privileges as those who were operating within the law. To so hold would do violence to the rules of construction which dictate that when a statute, in its entirety, is uncertain or ambiguous, and is subject to more than one construction, it shall, if possible, be construed to give effect to a sound public policy. Petitioner contends, however, that the 1933 act is not ambiguous and therefore that this rule does not apply. This contention could only be true if the proviso part of Section 13 referred only to carriers illegally operating. If it were intended to refer to all contract motor carriers then operating, within or without the law, then Section 26 would be unnecessary and redundant, insofar as legally operating contract carriers were concerned, as

there would be no necessity to again acknowledge their rights to continue operations.

There are other sections of the statute which indicate a logical reason for the presence of both Sections 13 and 26 in the act, without doing violence either to the rules of statutory construction or to a sound public policy. However, in view of the change in conditions when the 1945 amendment was passed, it is not deemed necessary to lengthen this opinion with a detailed analysis of each of the provisions of the 1933 act. Neither is it necessary to determine the legislative intent at that time.

In approaching the 1945 amendment to the act it is well to determine the purpose of the enactment. This is of importance in interpreting the act, as the purpose █ which underlies a statute is often regarded as speaking as plainly as the words forming the enactment.

The legislature in Article I, Section 1, and Section 34 of the 1933 Act declares the purpose of the Act:

Article I, Section 1:

"(e) It is hereby declared to be the purpose and policy of the legislature in enacting this law to confer upon the commission the power and authority and to make it its duty to supervise and regulate the transportation of persons and property by motor vehicle upon or over the public highways of this state in all matters whether specifically mentioned herein or not so as to:

"(1) Relieve the existing and all future undue burdens on the highways arising by reason of the use of highway by motor vehicle;

"(2) Protect the safety and welfare of the traveling and shipping public in their use of the highways;

"(3) Carefully preserve, foster and regulate transportation and permit the coordination of transportation facilities."

Article 5, Section 34, adds the following:

"The business of operating as a motor carrier for hire along the highways of this state is declared to be a business affected with the public interest. The rapid increase of motor carrier traffic, and the fact that under existing law many motor vehicles are not effectively regulated, have increased the dangers and hazards on public highways and make it imperative that more stringent regulations should be employed, to the end that the highways may be rendered safer

for the use of the general public; that the wear of such highways may be reduced; that discrimination in rates charged may be eliminated; that the use of the highways for the transportation by motor vehicles for hire may be restricted to the extent required by the necessity of the general public, and that the various transportation agencies of the state may be adjusted and correlated so that public highways may serve the best interest of the general public."

The legislature, in addition to declaring its purpose as set forth above, has in every act passed since 1933 made it an offense to operate as a carrier on the highways of this state without having secured a permit prior to operating. Accordingly, when we approach the problem of the right conferred on carriers by the 1945 amendment we are faced with the purposes intended to be accomplished by the legislature as announced in the 1933 act and the expressed denunciation by the subsequent legislatures of all who attempt to operate as a carrier without permission of the Commission.

Before treating the 1945 act, it is well to consider the rights of contract motor carriers as they were changed between 1933 and 1945. Chap. 65, Sec. 9, Laws of Utah, 1935, provides:

"* * * The commission shall grant on application to any applicant who was a contract motor carrier as defined by this act on the fifteenth day of March, 1933, a permit to operate as a contract motor carrier on the same highways and to carry on the same type of motor service as he was prior to said date. Where said applicants were operating on all the highways of the state prior to said date, the permit shall authorize them to continue to operate on all of said highways. The commission shall furthermore grant on application to any applicant who received a permit to operate as a contract motor carrier between the fifteenth day of March, 1933, and the date on which this act takes effect, a permit to continue to operate in the same manner and over the same highways as the terms of said permit allowed. * * *"

If, under the provisions of this act, we disregard the legality or illegality of operations we find the so-called "grandfather" rights granted to the following extent and no more: Carriers who were operating over *all* the high-

ways of the state prior to the 15th of March, 1933, were to be allowed this same privilege. The date of March 15, 1933, appears to be the latest date that would qualify a person to come under "grandfather" rights as the act provides that after that date the commission shall only be authorized to grant permits on application to those operators who received a permit after that date, and prior to the effective date of the 1935 act, and the new permit was to be limited to the same highways and the same manner of operation as were included in the original permit.

The act of 1935, in substance, continued in effect until the legislature enacted the 1945 amendment. The 1945 act amended the existing law in several particulars; however, only two are of importance to this decision.

Chapter 105, Section 3, Laws of Utah, 1945, is as follows:

"It shall be unlawful for any contract motor carrier to operate as a carrier in intrastate commerce without having first obtained from the commission a permit therefor. The commission shall grant on application to any applicant who was a contract motor carrier as defined by this act on the 1st day of January, 1940, a permit to operate as a contract motor carrier on the same highways and to carry on the same type of motor service as he was on said date. * * *"

The other section of the existing law amended by the 1945 act was Section 76-5-25 of U. C. A. 1943, Section 9 of the 1933 Act. This amendment consisted of deleting sub-sections (a) and (i) of Section 76-5-25, U. C. A. 1943, which enumerated those carriers exempt from the act. These subsections were as follows:

"(a) To contract motor carriers of property when operating wholly within the limits of an incorporated city or town and for a distance of not exceeding fifteen road miles beyond the corporate limits of the city or town in Utah in which the point of origin of any property or passenger movement is located or when operated within a radius of 15 miles from any point of origin outside of an incorporated city or town in Utah, and which movement either alone or in conjunction with another vehicle or vehicles is not a part of any journey or haul beyond said fifteen-mile limit; * * *

"(i) To the casual or occasional transportation of persons or property for compensation by any person not regularly engaged in transportation by motor vehicles as his or its principal occupation or business."

The effect of these latter amendments was to bring under the control of the commission all carriers operating within cities and towns and for a distance of not to exceed 15 miles beyond the corporate limits, and also to the casual or occasional operator who was operating but whose principal business was not transportation.

The wording used by the legislature in the 1945 act granted the right to continue operation to contract carriers *as defined in the act.* In the definition of a contract motor carrier, the legislature used the words "means any person engaged in." Admittedly the words "legally or illegally engaged in" were not used, so it becomes necessary to determine what the legislature intended when it defined contract motor carrier.

Since 1933 the various enactments passed by the legislature have used the same definition of a contract carrier, and in every act there has been an express provision that it was unlawful to operate on the highway without first having obtained a permit. It would be the height of inconsistency to ascribe to a legislative body an intent to include in the definition of "persons engaged in business" carriers who had been expressly prohibited by the same legislative body from engaging in the particular business. For many years the effect of the law was to prohibit the carrying on of a contract carrier's business without a permit, because it was made a crime so to do. In view of such prohibition it is inconceivable that the legislature intended to include within a preferred class of contract motor carriers those who had been illegally engaged in transportation. To repeatedly prohibit an act as being unlawful hardly indicates an intent to offer a premium for its violation.

American Jurisprudence, Vol. 50, Par. 381, has this to say in regard to statutory construction ■

"* * * Indeed, a purpose to disregard sound public policy must not be attributed to the lawmaking power, except upon the most cogent evidence, and it is the duty of the courts to render such an interpretation of the laws as will best promote the protection of the public, insofar as this may be accomplished in accordance with well established rules of construction. * * * In some cases, the words of a statute may even be restrained or enlarged so as to comport with principles of sound public policy. * * *"

To interpret this act as contended for by applicant would not only disregard sound public policy; it would further disregard the ordinary concept of not permitting rights to be acquired by committing criminal acts against the state, and in the final analysis, it would result in the unique doctrine of the more flagrant the violation the greater the rights acquired.

Even were we to concede that the 1933 legislature intended to grant "grandfather" rights to all carriers then travelling upon the highways, it must be considered that by the act of 1933 the legislature intended to tighten up the method of operation, to extend the authority of the commission, to more effectively regulate carriers, and to make it the duty of the Commission to more closely supervise the enforcement of the law. The legislature thus changed what had been a loose, haphazard method of controlling motor transport to a more unified, regulated and coordinated method. It not only made a violation of the act a public offense, but it also made the failure to comply with the orders of the commission a public offense; and subsequent legislatures, whenever dealing with the act, re-emphasized the necessity of complying with the provisions of the act. In light of this, it hardly seems that legislative bodies that were insisting on compliance with the laws and were intent on closer regulation would give a reward to the operator who had disregarded the regulations theretofore existing, and penalize the operator who had obeyed the law. It seems more consistent with legislative intent to prefer the citizen who was legally operating his business, and to discourage the one who violated the law.

We have not overlooked the legal principal that if the intent of the legislature is by the statute made clear and certain, event though we may believe the legislation absurd and undesirable, we cannot substitute the judgment of the court for the judgment of the legislature. On the other hand, when the legislative intent is not clear and certain, and a literal interpretation of the language of the statute gives an absurd result, then the court is justified in searching the enactment for further indications of legislative intent. These indications can be determined by the wording of the act or by considering the underlying reasons and necessity of the amendments and the purposes to be accomplished.

If the legislature did not intend to place a stamp of approval on illegal operations, then what was the necessity or reason for the court's extending "grandfather" rights under the 1945 act to legally operating carriers without extending them to operators not complying with the law? The reason was that the deletion of sub-sections (a) and (i) of Section 76-5-25 broadened the statute and brought within the provisions of the act every contract carrier operating within cities and town and also casual contract carriers, which necessarily included a great many legally-operating carriers.

Many of these operators had substantial investments in the business and had acquired the privilege to operate with consent of the State. Considering the date used in the act, they had been operating on the roads for at least five years, and it is reasonable to assume that there would be no necessity for them to establish the following facts: That their vehicles would not unduly burden the highways over which they had been operating; that their operations would not be detrimental to the best interests of the people of the state or the people of the localities served; that their trucks would not unduly interfere with the travelling public; and that their employment would not subject shippers to the hazards of dealing with irresponsible carriers. It is further reasonable to assume that their services were needed and

desired. Had they not been, it is doubtful that the operations would have continued over a period of five years.

Were it necessary for this court to determine why the legislature selected the year 1940, it could be determined logically and reasonably. Undoubtedly many operators were on the road in 1945 due to the large movement of war supplies. The record indicates a major portion of the hauling done by the applicant was in transporting these items. Conditions did not lend themselves to adequate checking and supervising of vehicles on the highways. To grant privileges to those operators who, because of movements incidental to war, had established themselves in business after 1940 might be founding rights on false and temporary conditions that would not be fair and reasonable to the carrier who had established permanency and stability. It would not be an unreasonable classification to prefer those operators who had established themselves during normal times, and who had been in business long enough to indicate their capacity to operate and their ability to satisfy and protect the public.

To uphold applicant's contention would create this ridiculous situation. In this particular case the applicant had no regular runs, he had no definite routes, his cargo consisted of every kind of commodity, and he had not limited his activities to cities or towns. He had no limitation as to the highways he used during the period he operated, and he hauled whatever anyone asked. Under his contention the Commission must acknowledge his "grandfather" rights, and this would permit him to operate on the same highways and carry on the same type of service that is, his operations would be unlimited, in spite of the wording of all acts from 1935 to 1945, saying that the right to travel all highways must have been acquired prior to 1933. In effect, his rights would be greater than any granted to operators legally conducting their operations after March 15, 1933, regardless of his being founded on illegality, and theirs on legality. Consider the operator who had complied with the law from

March 15, 1933, to the 1st day of January, 1940. His rights, if any, could rise no higher than those included in his original permit. These permits, of course, require loading and discharge points, and limits as to highways. All highways were not available for his movements, and all cargo not movable by him. The legal operator was restricted by the law, but lack of detection apparently permitted the applicant to roam the state at large. To permit the applicant to carry over all highways, and at the same time to restrict legally operating carriers to designated routes would be to grant a premium for illegality. We are convinced the legislature never intended such a result.

As stated in Sutherland on Satutory Construction, Section 241, at page 320: ■

"In the exposition of a statute the intention of the lawmaker will prevail over the literal sense of the terms; and its reason and intention will prevail over the strict letter. When the words are not explicit the intention is to be collected from the context, from the occasion and necessity of the law; from the mischief felt, and the remedy in view; and the intention is to be taken or presumed according to what is consonant with reason and good discretion."

To be consonant with reason and good judgment, this court is required to sustain the judgment of the Commission. It is so ordered.

McDONOUGH, C. J., and PRATT, WADE, and WOLFE, JJ., concur.