386 P.2d 900

**Joseph Thurston SMITH, Plaintiff and Appellant,**

**v.**

**Alyce M. SMITH, Defendant and Respondent.**

**No. 9755.**

Supreme Court of Utah.

Nov. 20, 1963.

Crockett, J., dissented.

Bushnell & Beesley, Salt Lake City, for appellant.

Gustin, Richards & Mattsson, William S. Richards, Salt Lake City, for respondent.

WADE, Justice.

Joseph Thurston Smith commenced a divorce action against his wife, Alyce M. Smith. The divorce was granted to the wife upon her counterclaim. He appeals only from that portion of the decree granting her the custody of their minor children. All but one of the six minor children were 10 years of age or over, and these five children expressed a preference to remain with the father, the appellant herein.

Under Section 30–3–5, U.C.A.1953, in divorce proceedings, where neither party is found to be an immoral or unfit person to have the custody of the children, must the children more than 10 years of age be awarded to the custody of the parent which is chosen by such child? In cases where the child is not entitled to make such choice

and child custody cases generally, we have emphasized that the best interest of the child is controlling.[1] Judges often disagree on what will be for the best interest of a child and the child's reaction to the award and many other factors may have a bearing on that question.

The above section provides " * * * that if any of the children have attained the age of ten years and are of sound mind, such children shall have the privilege of selecting the parent to which they will attach themselves." In Dorsey v. Dorsey,[2] speaking of this provision, we said: "[I]n case the parent the child selects is found to be an immoral or unfit person to have the care and custody of the child, and the court finds it to be for the best interests of the child, that the court may, nevertheless, determine the child's custody otherwise." We have found no case to the contrary, and we think this is a correct statement of the law. This requires a finding that the parent selected be an immoral or unfit person; otherwise, the child must be awarded to the parent chosen. It is unthinkable that a court would award a child to the custody of an immoral or unfit parent even though the statute does not expressly provide such an exception. However, a finding that the

best interest of the child requires that it be placed in other custody is not sufficient to justify the court in placing the child elsewhere.

Case reversed with directions that the children be awarded to the father, and that the decree conform to the views herein expressed. No costs awarded.

McDONOUGH and CALLISTER, JJ., concur.

CROCKETT, Justice (dissenting).

The main opinion reverses the decree granting custody of the children to their mother, the defendant, on the ground that the statute gives the children over 10 the absolute choice of parental custody. This supersedes the finding of the court that their best interest and welfare would be served by being with their mother and confers upon the father the incontestable right to their custody, so that the court is powerless to do other than to award the children to him. Because I am alone in my taking the opposite view, I acknowledge some degree of deference to the opinion of my colleagues. Nevertheless, because of the firmness of my conviction, I desire to set forth as clearly as possible the reasons for my conclusion.

1. Walton v. Coffman, 110 Utah 1, 169 P.2d 97; Anderson v. Anderson, 110 Utah 300, 172 P.2d 132; Sampsell v. Holt, 115 Utah 73, 202 P.2d 550; Smith v. Smith, 1 Utah 2d 75, 262 P.2d 283; Steiger v. Steiger, 4 Utah 2d 273, 293 P.2d 418; Johnson v. Johnson, 7 Utah 2d 263, 323 P.2d 16; Briggs v. Briggs, 111 Utah 418, 181 P.2d 223.

2. Dorsey v. Dorsey, 52 Utah 73, 172 P. 722.

In the first place, I am unable to reconcile the ruling of the majority with the more fundamental rules which have always been recognized as applicable to questions of child custody: that the welfare of the children is the paramount consideration, which overrides all others; that the trial court has broad discretion in making that determination; and that it will not be upset unless there is plain abuse.[1]

Secondly, it seems to me that the court's decision reaches its result by placing unwarranted literal emphasis upon only one clause of the statute, whereas I believe that if the entire statute and the background and purpose of the law are all given due consideration together, as they should be, the contrary conclusion will result.

Due to the position taken by my colleagues, that the statute is controlling anyway, I assume that no matter how praiseworthy the qualities of the defendant mother may be, nor however to the contrary with respect to the plaintiff father, nor however meritorious the case may seem for the mother having the children's custody, because of the children's choice, the award must, nevertheless, be to the father, unless he is completely unfit. This being the majority view, there would be no useful purpose in laboring in detail the question of the relative fitness of these parents. But I think it not amiss to observe in summary

that if we look at the matter in the light most favorable to the finding of the trial court, as we should do, there is ample basis to justify the conclusion that it is in the best interest of these children to be awarded to their mother. Yet, it is only fair to state that to characterize her as a completely blameless and long-suffering wife, and the plaintiff as a villain, would be naive and unrealistic. There obviously is here, as there always is, some fault on both sides. But the trial court, from its advantaged position, and with its acknowledged prerogatives, has chosen to believe her version of the evidence; found the issues in her favor; granted her the divorce, and has found that it would be for the best interest and welfare of the children to be in her custody.

To give the plaintiff his due, in spite of his faults, a good case can be made that he has a sincere desire to be a good father to his children; that he disciplines and manages them quite well; and that they love and respect him. However, beyond this, it also appears from the evidence that in all likelihood the plaintiff as a doctor and a psychiatrist assumes to himself an air of superiority; that he has tended to overshadow his wife; and is somewhat aggressive and domineering. There are some aspects of his conduct which, from a detached perspective, seem a bit irrational, the epitome of which is exemplified by a telephone call to the defendant, during the emotional

---

1. See cases in footnote 1 of the main opinion.

throes of their trouble, in which he clung on to the conversation continuously for nine hours.

Plaintiff's aggressiveness and tenacity is manifest in this proceeding itself. He initiated the divorce action against his wife, bent upon disgracing her and taking the children away from her. But as to the hypothesis upon which he proposed to do so, that she was immoral and unfit, he failed in his proof, and the trial court found the other way. He nevertheless stubbornly insists that he is right, and that the court itself has no power to decide the issue against him. It is obvious that the economic leverage he has is at least one of the important factors influencing the choice of the older children. Under the circumstances shown, it strikes me as an egregious miscarriage of justice to thus reward his aggressiveness and intransigence.

Further, and more important than the result in this case, is the fact that the holding with respect to this statute seems to me to completely distort its true purpose and reaches a high point in forebearance of the judicial prerogative, if not an outright abdication of judicial duty. If the mere fact that a child has become 10 years old endows him with power to make a choice of his parental custodian, which must be honored in any event, and whether his reasons are good or bad, or in fact whether he has any reasons at all, so that his choice

is absolute and not subject to control or review by anyone, even by the court, he could be empowered to make a decision of the gravest possible consequence to himself, his family, and society, under circumstances where, because of his immaturity, and the usual emotional stress, there is little assurance that his judgment would be sound. It would be one of the most arbitrary and far-reaching prerogatives known to the law. This is plainly nonsensical and impractical.

Fortunately for society and the individuals in it, the law does not function by singling out and placing all of the emphasis on one clause in a statute. Throughout the long and prideful history of our common law system, its principal merit has been that instead of casting aside reason and clinging slavishly to unintended literalness, its usefulness and its durability have been served by applying the rule of reason to adapt it to the practical exigencies of life. The cardinal principle has constantly been adhered to that when the course of justice is clear, it is the purpose of the law and the duty of the courts to fashion it out of the materials available.

A study of the decisions will show that it has invariably been considered that in basic structure our law is of more profound character than a mere catalog of words or rules to be applied to the affairs of life in mechanical fashion; and that it has always

been regarded as a proper judicial function to give it a reasonable and sensible application to avoid unjust or absurd results. Correlated to this is an appreciation that in the multifariousness of legislation it is inevitable that there will at times be conflicts between provisions of the law; and that it is difficult for statutes, which necessarily must be in general language, to apply to the variety of life with absolute clarity and precision in all instances. Consequently, where by inept wording, lack of certainty, or simply through error or inadvertence, the statute is such that too literal an interpretation would produce absurd results, the courts have wisely looked beyond such frailties or superficialities to the background of the statute to find the true intent and purpose sought to be accomplished; and similarly, where there appears to be conflict, a provision of law which is paramount in the public interest will prevail over one which is less important. The cases to this effect are myriad. A few examples which, it is hoped, will sufficiently illustrate the point will be given below to show that invariably where, "The letter killeth, but the spirit giveth life," [2] the court will look to the rationale of the act and its objective rather than being bound to some literal interpretation which would produce results inconsistent with the purpose of the law.

2. 2nd Corinthians, 3:6.

The doctrine just spoken of dignifies the rule of reason. There is no more vital precept than that no man, however high or low his station, nor whatever the right he claims, nor even the law itself, should be above the rule of reason. This comes to us from antiquity and has persisted as the transcendent force in the law. As stated in "Sources Of Our Liberty" [3] p. 27 in reference to the power of the courts to refuse to give effect to legislative acts on constitutional grounds, " * * * it was the common law generally and the principles of common right and reason which constituted the *higher law* appealed to and not the specific provisions of Magna Carta. This step was taken early in the 17th century when Lord Coke said in his famous dictum in Bonham's Case:

" 'And it appears in our books, that in many cases, the common law will controul acts of parliament, and sometimes adjuge them to be utterly void; for when an act of parliament is against common right and reason, or repugnant, or impossible to be performed, the common law will controul it, and adjudge such act to be void.' "

The principle under discussion was clearly recognized and forthrightly stated in Johanson v. Cudahy Packing Company.[4] The statute literally would have required de-

3. Perry-Cooper, published by the American Bar Association in 1952.
4. 107 Utah 114, 152 P.2d 98.

pendents who had elected to take workmen's compensation to wait until they had been paid in full before commencing suit against a tort feasor. The court rejected this and said:

"By so holding we are cognizant of the fact that we are *not following the literal wording of the statute, but such is not required when to do so would defeat legislative intent and make the statute absurd.* In this regard see Robinson v. Union Pacific R. Co., 70 Utah 441, 261 P. 9; Brackett v. Chamberlain, 115 Me. 335, 98 A. 933; Nichols v. Logan, 184 Ky. 711, 213 S.W. 181. We must hold that payment in full is not a condition precedent to suit. The amount of payment made and time of payment is of no concern of the third party except insofar as necessary to protect him against another suit for the same wrong."

In Rogers v. Wagstaff,[5] this court interpreted the word "minor" in a driver's license statute to include all persons under the age of 18, and did not recognize the usual statutory exception which emancipates a person from minority when married, saying that to do so would not conform to the intent of the legislature.

In Rowley v. Public Service Commission,[6] this court refused to follow a literal wording of a statute, Laws 1945, c. 105, § 3, which provided that, "The commission *shall* grant on application to any applicant who was a contract motor carrier * * * on the 1st day of January 1940." Rowley had been, in fact, so operating, but without proper authority. The court concluded that to follow the statute literally would produce an unreasonable, if not absurd, result not intended by the legislature and refused to do so.

In the case of Peay v. Board of Education[7] the validity of a leeway school financing program was challenged. In reading the entire context of the act it appeared obvious that the legislature had referred to the wrong section of a previously existing statute. The reference should not have been to 53–2–12 (U.C.A.1953), but should have been 53–7–12 (U.C.A.1953). This court had no hesitancy in reaching unanimous agreement that the statute should be read as it correctly should have been written to give it a sensible and practical effect.

In the recent case of State v. Bassett,[8] we construed a statute which penalized prisoners serving a term *less than life* who attempted escape. The defendants argued that inasmuch as they were serving indeterminate terms of certain years to life, which had been judicially construed as a sentence for the maximum (life), that the statute literally would not apply to them.

5.  120 Utah 136, 232 P.2d 766, 26 A.L.R. 2d 1316.
6.  112 Utah 116, 185 P.2d 514.

7.  14 Utah 2d 63, 377 P.2d 490.
8.  14 Utah 2d 412, 385 P.2d 334 (October 1, 1963).

Very properly resorting to the rule of reason, the court went into the legislative history and intent, concluding that the legislature had not intended to leave prisoners serving such sentences immune from punishment for escape.

The legion of cases supporting the universally recognized doctrine underlying the cases just cited above, and the principle for which they stand, was well expressed for this court in Norville v. State Tax Commission.[9] Therein the statutory definition of a merchant was judicially corrected to include words inadvertently omitted. The court quoted the eminent authority on statutory construction, Sutherland:

"In the exposition of a statute the intention * * * will prevail over the literal sense of the terms; and its reason and intention will prevail over the strict letter." (Citing numerous other authorities.)

A landmark case on this proposition from the Supreme Court of the United States is that of Church of the Holy Trinity v. United States.[10] It reviewed a law making void contracts by which indentured laborers were brought from Europe and kept in servitude. Literally applied, it would have made void a contract by which the church brought a minister from England. The

court rejected the church's attempt to avoid its contract. After fully discussing the matter and citing foundational authorities, the court said:

"It is a familiar rule, that a thing may be within the letter of a statute and yet not within the statute, because not within its spirit, nor within the intention of its makers."

In accordance with the foregoing authorities, in divining the meaning of the statute here in question, it should be considered in the light of the historical role courts have played in divorce proceedings and of the entire act treating the subject in a manner to harmonize with the purpose sought to be accomplished. Anciently, and without variation to the present day, such proceedings, and especially, the phase dealing with child custody have been considered equitable in a high degree, over which the court, because of the interest the public has in the family and the children, has exercised plenary powers. In earlier times the courts actually assumed the role of guardians of children in families broken by divorce;[11] and have always regarded the custody of children as of the most vital importance. Acceptance of the rule proposed by the plaintiff would greatly limit the court's ability to perform this important duty. The

9. 98 Utah 170, 97 P.2d 937, 126 A.L.R. 1318.
10. Church of the Holy Trinity v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L. Ed. 226 (1892).

11. See statement on this subject by Justice Wade in Walton v. Coffman, 110 Utah 1, 169 P.2d 97, referring to authorities.

incongruity is pointed up by the fact that this decision does not affect the custody of Naniloa, age 7, nor can it take into account the desirability that she be with her brothers and sisters.

It is submitted that if the whole structure of the divorce law is looked at in the correct light it will be seen that the clear purpose of the legislature was to grant to the court discretion to do what it has always done, i. e., whatever justice and equity require in regard to the parties, the children and the property rights, and that there are a number of reasons why it is unthinkable that the legislature intended a 10-year-old child to have any such absolute and incontestable power.

Under such a rule, parents already too deeply immersed in woes because the family is breaking up would have them added to by having to compete with each other for the children's choice. Without elaborating thereon it is easy to see the hazards to them and to the child this would create. Such a battle might well go to the more unscrupulous parent, who may not be above poisoning the child's mind against the other; or resorting to coercion; or showering him with ill-advised gifts or favors. Even more damaging would be the subjecting of a child to such pressures and making him a pawn in the contest of the spouses for his custody. It is extremely doubtful that under such circumstances a child of that age would have the stability and judgment to see

through the maze of troubles and make a wise choice. In some instances it would be cruel to subject him to it and wholly unrealistic to regard his choice as absolute.

Because of the foregoing, the court should be reluctant indeed to place this responsibility upon a small child, forcing him to face and cope with difficulties which the parents themselves have found insurmountable. This is especially so when a further effect is to rob the court itself of the role the law obviously intends it to play as arbiter and conciliator of troubles which have proved too much for the family to deal with.

It also must be remembered that any award of custody made by the court must necessarily be an integral part of the overall adjustment of the family situation. The provision by way of support money or property settlement, and the values to be found in children being together, are considered by the court in judging what is best for the welfare of the entire family. This could all be lost if the choice were dependent entirely upon the whim or caprice of a 10-year-old child.

There is another reason why I think it is indisputably clear that it was not intended to invest the child with any such absolute power. The provision upon which the decision rests that the children 10 years old, " * * * shall have the privilege of selecting the parent to which they will attach

themselves" presents just two alternatives: it either means that the child has the choice and that it is absolute and incontestable; or that the choice is subject to veto by the court under some circumstances. If the former, then his choice would be absolute whatever the conditions. If the latter, then his choice is not absolute but is subject to review by the court and to veto under proper circumstances. That the latter is the case is inescapable. Everyone, even the plaintiff's counsel, concede that if the child chooses a parent who is so physically or mentally unfit, or so morally depraved as to be totally unsuited to be his custodian, the court does not have to honor such a choice. This court long since so decided in the case of Dorsey v. Dorsey.[12] This shows conclusively that the general supervisory power of the court over the welfare of the children supersedes the choice of the child. It is true that the court there saw fit, very properly it seems to the writer, to set aside the finding that the mother was an immoral and unfit person and to give her custody of the child. But Justice Frick, whose opinions have imparted much wisdom to the law of this state, supported by a unanimous court, nevertheless took occasion to make some observations about the statute allowing a child who has attained the age of 10 to choose his custodial parent. The court pointed out the equitable nature of the divorce proceeding and its concern about the custody of children. Referring to the statute, it said: " * * * . *[Y]et in our judgment the statute is not conclusive upon the question of custody and control.* We think in case the parent the child selects is found to be an immoral or unfit person to have the care and custody of the child, and the court finds it to be for the best interests of the child, * * * *may, nevertheless, determine the child's custody otherwise.*" To the best of my knowledge, that has quite generally been accepted as the law ever since the advent of that opinion, and the bench and bar of our state have looked to it for guidance in applying this statute. Our research has failed to find any holding to the contrary, and if there ever has been, no one has cited it. That view is in harmony with the traditional policy of the courts of maintaining the keenest interest and surveillance over the interest and welfare of children, which, of course, involves vital concern over their proper custody.

It being thus clearly shown by the Dorsey decision just discussed that the court does have some power of supervision and veto over the choice of the child, the only question then is the degree of such power of supervision. Inasmuch as the court can veto the child's choice on the ground of fitness, there is no logical escape from the conclusion that the court must then have the prerogative of determining the degree of fitness or unfitness of the parents. This

12. 52 Utah 73, 172 P. 722.

is so as a practical matter because the question of being fit or unfit is something which is rarely seen as either all black or all white. Seldom would one parent be either completely insane, immoral, an utter drunkard, or otherwise so entirely lacking in parental qualities as to be totally unfit, as contrasted to a spouse who is a paragon of all of the virtues. Human personalities are so variegated that the question of fitness or unfitness is practically always a comparative one, and of necessity the court is both empowered and obliged to take the responsibility of determining on a comparative basis which parent is the one "fit" to have custody for the best interest and welfare of the child.

Returning to the wording of the statute in question, with the foregoing discussion in mind, I fail to see in the language itself any justification for such an absolute and rigid application as the plaintiff insists upon. In view of the radical departure this interpretation would be from the historical role of courts in child custody cases, if the legislature had intended the child to have any such absolute power, or that a parent would acquire any such incontestable right by such a choice, it undoubtedly would have said so in plain and unmistakable language, specifying that the choice was the child's as a matter of *right;* and that pursuant to it the parent chosen had the *right* of custody; and would have made these rights secure by providing that the court must follow the choice indicated. But it did not do so.

Giving further attention to the precise wording of this clause of the statute, we should assume that in giving the children the " * * * *privilege* of selecting the parent to which they will attach themselves," the word "privilege" was used advisedly, and that it does not go beyond a mere "privilege" and thus does not create any absolute right either in the child or parent. The provision can most reasonably be understood as allowing the child to make his selection and so indicate to the court, which the court can, and indeed should, give due consideration to in arriving at its judgment. But the ultimate determination on the issue should be for the court to decide, as are all of the other rights of the parents and children in divorce proceedings. I see nothing in the statute, or in our decisional law, making the child's choice absolutely mandatory upon the court.

Careful attention to the section in question will bear out the foregoing conclusion. It both begins and ends with a general statement indicating full power in the court to deal with the parties, their children and their property. The proviso that the children have the "privilege" of selecting a custodial parent is interpolated between the provisions which confer these plenary powers on the court. There is no justification for making the one clause absolutely controlling over those provisions as well as

**46**

over the correct foundational theory of such proceedings. I suggest that if we are going to do so, and become that literal and technical, we should examine the statute more carefully and note that after the proviso with respect to the privilege of selection follows the concluding sentence, which says, "[s]uch *subsequent* changes or new orders may be made * * * with respect to the disposal of the children * * * as shall be reasonable and proper." Subsequent means afterward. One minute, or one hour is just as truly "subsequent" to the choice as is one month or one year. Thus, literally, *after* the choice is made, the court is authorized to make any *"subsequent"* changes it deems proper. The significant thing about this concluding sentence is that it is entirely consistent with the general powers which the court has always had and exercised in such matters and which reason dictates is necessary to adequately deal with them. The question arises as to what reason in law or logic could there be in interpreting the statute as meaing that at the time of the divorce the child had the absolute right of choice, and that "subsequently," which could be immediately, the court has plenary powers to make any order with respect to the children as it shall deem proper. To see this necessary and proper power in the court certainly does not require any disregarding nor distorting this statute. It only requires looking at the whole statute together in such a way that all of its parts harmonize with each other and with the background structure of the entire law on the subject, as contrasted with considering in isolation and placing an unwarranted literal emphasis on one clause to the exclusion of all of the rest. Inasmuch as it appears to be entirely feasible to give the court the means of dealing with the problems involved in a sensible and practical way, the law should favor and adopt an interpretation of the statute, which would achieve that purpose and avoid an otherwise unreasonable and impractical result.

I would affirm the trial court. (All emphasis added.)

HENRIOD, Chief Justice (concurring).

I concur with the majority opinion. In doing so I am constrained to answer the dissent and point out what I consider its infirmities.

1. It says that since the main opinion follows the statute, consequently the children may choose the father "unless he is completely unfit." The main opinion said no such thing and didn't even imply it. The trial court found the father to be *completely* fit, so that the dissent's assertion is a complete non sequitur.

2. It says we look at the case in a light most favorable to the trial court's finding, and then concludes that its decision in

giving the mother custody should be affirmed. The dissent misconstrues its own interpretation of the rule stated, since at least one of the *findings* of the trial court was that the father was a fit and proper person to have the children's custody. Looking at the case in a light most favorable to *this* finding, this court has nothing to do but apply the statue, which clearly gives the child his choice in such case.[1] Otherwise, we would simply flout the statute and indulge ourselves the luxury of judicial legislation.

3. The dissent asserts that because the father was a psychiatrist it is likely that he "assumes an air of superiority" tending to overshadow his wife, he being aggressive and domineering. This court on review cannot entertain such an assumption. The father was found to be a fit and proper person, and any aspersion to the contrary by attaching significance to a nine-hour phone conversation with his wife, completely is dispelled by the fact that there are two parties to a telephone conversation, and any significance attached to such a call, if there be any, ordinarily would be attributed to a common complaint leveled against the opposite sex.

4. The dissent implies that to allow this father to have custody is an egregious miscarriage of justice and simply is to arrive at some sort of sociopaternalistic conclusion not shared by the legislature. The father, I repeat, was found to be a fit and proper person to care for his flesh and blood, and the question looms large: What is wrong with such a father doing so, or having a desire therefor?

5. Considerable stress is laid by the dissent on the judgment of a 10-year-old. What about the judgment of the 17½ year-old girl and the other three children ranging in ages between those extremes? At 18 the girl could marry. At 18 a boy goes to war. Under the statutes a 14-year-old boy is held responsible for his criminal acts. The legislature obviously thought that all things being equal, and both parents being fit, one 10 years old, or older, had enough sense and judgment to live with one or the other of his natural parents, according to his choice. It seems safer, so far as the humanities are concerned, to let the elected representatives of the people set the age of discretion in such case, than to leave the decision arbitrarily to one man, a judge, who might personally prefer one over the other of two spouses. I am of the opinion that more than once a 10-year-old has proven himself more capable of determining his best interests in the area of filial feeling

---

1. All five children, one of whom was a girl 17½ years old, chose the father with whom to live.

and domestic relations than has a judge, who, in the last analysis, has not popped corn in the kitchen or helped to trim a Christmas tree with such youngster.

6. The authorities cited in the dissent are not analogous or apropos. Johanson v. Cudahy has to do with a statute where the results would render the statute absurd, and where time of payment by a third person could be none of the latter's concern. *That* case is not *this* case, where there is *nothing* absurd about the statute, but which only represents legislation with respect to an age of discretion, the legislature in clear language considering 10 years or more to be reasonable, whereas a socio-economic school of thought may consider it not only unreasonable, but that one man arbitrarily should be able, in his sole discertion, to thwart the will of the electorate. The door is open to this school, and has been since 1888,[2] to convince the legislature it was wrong, and to change the statute. Rogers v. Wagstaff is no authority for the dissent's thesis, as a casual reading thereof will reflect. As to Rowley v. Public Service Commission, this court simply interpreted a statute and determined legislative intent, and is hardly authority for the dissent's position when it said that "if the intent of the legislature is by the statute made clear and certain, even though we may believe the legislation absurd and undesirable, we cannot substitute the judgment of the court for the judgment of the legislature." Peay v. Board of Education does not support the dissent, having to do only in determining legislative intent where, according to the context of the act, a typographical error had been made as to the number of a section, which, without reasonable interpretation, made no sense and obviously was a "patent error." State v. Bassett has no pertinency in favor of the dissent, since in that case the statute was interpreted in connection with another statute in the light of legislative history and case law,—factors not present here where, without change, the statute as to child custody had persisted for three-quarters of a century. Norville v. State Tax Comm. is completely foreign to the dissent's position, since it deals with an ambiguous statute and proceeds to interpret it, whereas in the instant case no one can find any language that was not "explicit," the dissent failing to quote the more significant language of that case that "When the words *are not explicit* the intention is to be collected from the context." Church of the Holy Trinity v. United States adds no weight to the dissent's philosophy or accuracy.

7. After citing cases that are not authority, almost half of the dissent is then

---

2. Compiled Laws of Utah 1888, Sec. 2606.

devoted to the evasion of the real issue here by expounding an unjudicial, albeit social sophistry lacrimatory to the paternalistic, but irresponsive to a dry-eyed legislature elected by the people, and quite unconvincing either to the legislature or those in the 10 to 18-year-old class, who may consider that their judgment with respect to a relationship with their parents is not puerile or infantile. Kids 10 years and older generally have pretty good sense, including a sense of greater devotion to one or the other of their parents. If their parents do not have sense enough to bring these kids to full fruition because of factured domestic relations why give one judge the awful power to force five kids to live with one of the recalcitrants against their expressed wishes, where the two homebreakers nonetheless are found to be equally fit to raise their children according to the latter's choice of parents.

The dissent talks about children becoming pawns on the occasion of a divorce. *They always are* and invariably suffer more than the parents who brought them here without any choice on the offsprings' parts. Perhaps the legislature was not so unwise after all in letting the kids reverse the situation, have a genuine choice as to their future, make pawns, for a change, out of their parents and say that although there be a plague on both your houses, I want to live in the one in which I want to live. (Emphasis mine.)