In the Matter of the Custody of the Minors

**LOUIS ANDRE LA PLACE and**

**LAWRENCE LA PLACE**

Civil No. 861-1967

Municipal Court of the Virgin Islands

Div. of St. Croix

Christiansted Jurisdiction

December 18, 1967

FELIX A. BELLO, ESQ., Assistant Attorney General, *for Government*

BIRCH, MADURO, DEJONGH & FARRELLY (ALEXANDER A. FARRELLY, ESQ.), *for respondent*

JOSEPH, *Judge*

## OPINION

The matter of the custody of two young children, Louis Andre La Place and Lawrence La Place, aged seven and six, respectively, is before this court on a writ of habeas corpus brought by the Government of the Virgin Islands. The writ was directed to Ruby M. Rouss with whom the children are presently residing under a foster care arrangement made by the Department of Social Welfare. Testimony of witnesses for the Government and witnesses who appeared on behalf of Miss Rouss and the children was heard in open court on November 2, 1967. The evidence, most of which is undisputed, is summarized below.

Louis and Lawrence La Place are the children of Gloria Rivera Allen and Andre La Place. The parents of the children do not live together. When these two little boys were approximately six months and a year and a half old and their mother was 16 or 17 years old physical custody of the children was taken from her. In 1963 their legal custody was placed in the Department of Social Welfare by order of the Municipal Court of St. Thomas and St. John. At the time the children were taken from the mother they were suffering from malnutrition, and it was determined that the mother did not adequately feed or clothe them and that she left them unattended. In March, 1963

the children were placed in the Queen Louise Home, an institution for the care of children located at Frederiksted, St. Croix. There they remained until July, 1966, when Miss Rouss took them into her home. The mother visited the children at the Queen Louise Home on a few occasions within the first two months they were there but has had no contact with the Home or the children there since that time. There was testimony of one witness that the mother saw the children on one occasion in 1964 but no information was given as to the nature or extent of the contact she had with them, if any. She was once invited to visit them after they were placed with Miss Rouss but she declined to do so, saying that it was too late in the day. There was no evidence presented to the court that she has any interest in the children or desire to have them with her. She was not called as a witness by the Government nor did she appear at court for the hearing. The father, who has contributed to the support of the children but has had no personal contact with them since they were taken from the mother, appeared as a witness for Miss Rouss and testified that he was opposed to their being returned to the mother as she had abandoned the older child when he was an infant and he did not believe that she would give them proper care at this time. He strongly favored leaving the children with Miss Rouss.

The Department of Social Welfare in the latter part of August, asked Miss Rouss to return the children as it had been decided to place them with their mother. Miss Rouss refused to do this without a determination of the court in the matter. The children, when she took them into her home, had known nothing but institutional life. She had met the "real challenge" of their adjustment to a family life where they are given individual love and attention. In dealing with the children she has shown a natural

understanding of them and has been able to identify their problems and thus work toward their solution. She has placed the children in a private day school where she is active in the parent-teachers activities, having recently been elected an officer in the association. The Government concedes that the home which Miss Rouss is providing for the children is satisfactory in every way and offered no hint or suggestion that it could be improved upon. In fact, the only Government witnesses who were familiar with her home and with the care she is giving the children were high in their praise of her as a foster mother.

The only reason given by the Government for its decision to move the children is the fact that it is the policy of the Department of Social Welfare to return children to parents when this can be done. Mrs. Bernice Schuster, District Child Welfare Supervisor, who accepted responsibility for the decision to move the children, had never visited Miss Rouss's home and expressed no interest in it. She testified that the one concern of her agency was the mother and that she and her agency were interested in restoring the children to the mother and not in the traumatic experience to the children of again being uprooted. In fact, she stated that the children are not a factor to be taken into consideration.

Mrs. Schuster who is the only witness having familiarity with the mother testified that she is now 25 years old and employed, receiving slightly more than $200 per month from her employment and from support payments she receives for another child. Mrs. Schuster says that the mother is now rehabilitated, although she does not say in what way, and that the Department's plan is to place the children with her but to supervise her home and if it is found that she is not ready to accept the responsibility of the children they will again be removed.

One Government witness, Mrs. Mary Frances Brown, the child welfare worker who had been instrumental in the placement of the children with Miss Rouss, testified that the removal of the children from her home might have a highly traumatic effect upon them. Her testimony, which was the only offered by the Government which dealt with the best interests of the children, does not lend support to its position.

Copies of the foster care agreements which were signed by Miss Rouss as foster parent and by Mrs. Brown as Child Welfare Worker for the Department of Social Welfare have been introduced in evidence. The Government relies upon paragraph six thereof which is contained in the provisions thereof, as follows: "* * * we agree to comply with the following requirements of the Department of Social Welfare: * * * 6. To give up the child when requested by the Department (advance notice will be given to foster parents)."

The Government is asking this court to exercise one of its most solemn powers, that of determining the custody of children, either by blindly accepting an agency determination which admittedly was not based upon the principles which must guide the courts, or by treating the matter of custody as a suit for the specific performance of a contract. The court can do neither of these things. As Justice Traynor so aptly pointed out in the case of In re McDonald's Adoption, Cal. 1954, 274 P.2d 860, 868, cited by respondent in argument, "In a proceeding such as this the child is the real party in interest and is not a party to any agreement. It is the welfare of the child that controls, and any agreement others may have made for its custody is made subject to the court's independent judgment as to what is for the best interests of the child."

That this "independent judgment" cannot be delegated is illustrated by the case of Crump v. Montgomery, Md.

1959, 154 A.2d 802. There a child born to an unwed mother was placed with the Montgomery County Welfare Board for adoption. The Welfare Board arranged for his foster care in the home of Mr. and Mrs. Crump while completing the adoption procedure for him. When he had been with the Crumps for approximately 15 months and adoptive parents had not been selected for him they requested the Board's approval of his adoption by them. The Board refused, stating that they had a policy against foster parents being permitted to adopt a foster child and that the Board had "closed its adoption list." The Board thereafter took the child from Mr. and Mrs. Crump and he was placed with another couple, Mr. and Mrs. Montgomery, for adoption. Both couples petitioned the court for his adoption. The court ruled in favor of the Montgomerys, saying that it felt bound to accept the determination of the Board that that was in the best interests of the child. The Maryland Court of Appeals remanded the case to the Circuit Court, holding that that court could not delegate to the Board its responsibility of determining what is in the best interests of the child and stating, at page 808,

"Of course, the Chancellors were at liberty in this case to receive reports and recommendations from Welfare Boards and other qualified persons and boards, and to give these reports and recommendations such reasonable weight as, in their judgment, they deemed proper; but, after all the evidence was in and arguments heard, it was the function, duty and responsibility of the court ultimately to decide what was for the best interests of the child; and this duty and obligation cannot be abnegated in favor of any Board or person."

The Court of Appeals also admonished that, "Another matter that the Chancellors should have thoroughly considered and weighed is that the adoption of Johnnie by the Montgomerys involved a change from the home, locality and environment in which he had been, practically, since birth."

That "the stability of the home life of the children is an important and vital factor" was also recognized by the California Courts in Fine v. Denny, 244 P.2d 983, 984; and in Washburn v. Washburn, 122 P.2d 96, 100, and that "a change of custody would disturb the child's established mode of living" in Bemis v. Bemis, 200 P.2d 84, 91.

The Government has cited New York Foundling Hospital v. Gatti, Ariz. 1905, 79 P. 231. There petitioner, New York Foundling Hospital, was an institution authorized by the laws of New York to receive and keep under its charge children deserted or abandoned in New York City or left in the charge of the hospital. It sent 40 young children, ranging in age from one and a half months to five years, to Arizona at the request of a priest where they were placed in the homes of half breed Mexican Indians who lived generally in extreme poverty and under the most primitive conditions. Irate citizens of the Arizona community took many of the children from the Indian foster parents and provided homes for them among the responsible citizens of the community. The citizens' actions in this matter resulted in the other children being taken back to New York by the Foundling Hospital. However, 19 of the children remained in their new homes, the self imposed foster parents refusing to release them. The Hospital filed a petition of habeas corpus to regain custody of each of these children. The Court dismissed the writ holding that neither the New York agency nor the respondents have any such legal claim as authorizes the court for that reason to award them custody of the children but that the court itself must decide what was in the best interest of the children. The court ruled in favor of respondent foster parents, rejecting the claim of the petitioner that its legal status as custodian gave it the right to withdraw the children from any foster home.

Neither of the other cases relied upon by the Government would serve as authority for this court to take the action

requested. In Sherry v. Doyle, Utah 1926, 249 P. 250 48 A.L.R. 131, the father of a child whose mother died placed him with a couple to be boarded and cared for at an agreed charge. Thereafter he found a home where he could live with the child and sought its return which was refused. He instituted habeas corpus proceedings. The court held that he was a fit and proper person to have custody of the child and that as he was not guilty of laches or forfeiture the best interests of the child would be served by being under his control where he would have the association and companionship of his father. The court also considered the advantages offered the child by the influences and surroundings in the two homes and found that they would be as good if not better in the home offered by the father.

In Turner v. Children's Home Society, Va. 1932, 163 S.E. 399, 80 A.L.R. 1125, the Society, which had been given custody of a child by order of the Circuit Court of Dinwiddie County, Va., placed the child in the Turner's home and thereafter decided that this home was not suitable for the child. The foster parents refused to return the child and the Society filed a petition for a writ of habeas corpus in the Hustings Court of the City of Richmond. That court granted the writ and its action was affirmed by the Virginia Supreme Court of Appeals which held that the action of the Circuit Court in awarding custody to the agency was binding on the Hustings Court and could only be modified or revoked by the court making the original award. The Court stated:

"An examination of the provisions of these chapters [dealing with children who are wards of the State] reveals that the welfare of such children is the paramount object of this legislation, and that the State has nowhere surrendered absolute control of such children to any agency. The commitment of a child to a licensed agency is not final, but may be modified or revoked whenever the court which entered the order of commitment is of opinion that the welfare of the child will be promoted by such action."

■ In the present case, in the absence of any evidence that the best interests of these two young boys would be served by uprooting them from an environment where they are progressing satisfactorily and are being well cared for, and placing them in an environment new to them and unknown to the court, would not be within the permissible discretionary powers of this court. For this reason the writ of habeas corpus will be dismissed.